UNITED STATES of America,
Plaintiff-Appellee,

v.

Bernard M. PESKIN,
Defendant-Appellant.

No. 74–1450.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 13, 1975.

Decided Dec. 10, 1975.
Rehearing and Rehearing En Banc
Denied March 8, 1976.

Thomas P. Sullivan, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., John W. Cooley, Philip C. Parenti, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice,* FAIRCHILD, Chief Judge, and SPRECHER, Circuit Judge.

FAIRCHILD, Chief Judge.

Appellant Peskin was indicted on 14 counts of a 23 count indictment charging conspiracy to violate the Travel Act, 18 U.S.C. § 371, substantive violations of the Travel Act, 18 U.S.C. § 1952, and tax fraud, 26 U.S.C. §§ 7201, 7206(1). The indictment alleged that Peskin, representing Kaufman & Broad, Inc. (K & B) (a home builder of national stature headquartered in California) had passed money to public officials of the Village of Hoffman Estates, Illinois in return for approval of a K & B zoning proposal. Peskin's coindictees, K & B, the former Mayor of Hoffman Estates (Roy Jenkins), and five other village officials (James Sloan, Howard Noble, Gerard Meyer, Herbert Gibson and Edward Pinger), pleaded guilty. Peskin was convicted by a jury on the conspiracy count, five substantive Travel Act counts, and one count of making a false statement on an income tax return.

On appeal Peskin contests the sufficiency of the evidence to establish the federal jurisdictional elements of the Travel Act, the denial of suppression of evidence, certain evidentiary rulings, and other alleged errors. For the reasons that follow, we affirm his conviction on all counts.

## I. THE PAYOFF

Peskin, an attorney, handled various real estate matters for K & B. In November, 1967 Peskin advised Edward Stulberg, a K & B vice-president, that Rossmoor Corporation was about to sell a large tract of real estate in Hoffman Estates, Illinois. With a view toward residential development, K & B negotiated and agreed to purchase two parcels, one of 320 acres and the other of 90 acres. The sale was contingent on K & B obtaining satisfactory rezoning of the property.

Over the summer of 1968, the Village Zoning Board of Appeals held hearings on the proposed K & B rezoning, ultimately recommending approval of the plan to the Board of Trustees.[1] The evidence indicates that during this period Peskin approached Mayor Jenkins offering money to obtain approval of the rezoning. The evidence also shows that several village officials demanded $25,000 in return for approval of the K & B proposal. By late September K & B was prepared to pay at least $100,000 for zoning approval.

On October 10, 1968, the Board of Trustees adopted the Board of Appeals' recommendation to approve the K & B plan, but at a meeting the following week the Board voted against the ordinance effecting the change, giving a basis for an inference that the village officials were squeezing K & B for more money. Before the next Board meeting Jenkins and Peskin met with those trustees who had opposed the ordinance to persuade them to change their votes. At a Board meeting October 24, at which Peskin and Stulberg were present, the Board voted to reconsider, and the matter was placed on the agenda for October 30.

Sometime in October, agreement was reached on the amount of the payoff and manner of payment: K & B would pay through Peskin $35,000 in cash to be distributed among Jenkins, Noble, Sloan, Meyer, Gibson and Pinger at the time the rezoning was accomplished. An ad-

---

* Associate Justice Tom C. Clark (Retired) of the Supreme Court of the United States is sitting by designation.

1. In 1968 zoning changes in Hoffman Estates were first presented to the Zoning Board of Appeals. After reviewing the proposals, this body would recommend an appropriate disposition to the Village Board of Trustees, whose chairman was the Mayor. The Board of Trustees would then accept or reject the proposal. If accepted, an ordinance embodying the change would be adopted by the trustees.

ditional $35,000 would later be paid to these officials as occupancy permits were issued as construction of the housing development progressed. There was also talk of a transfer of a gasoline station site in the new development as a part of the payoff.

Since the K & B payment was to appear to be a fee for Peskin's services, it would be necessary to increase the payment from K & B to Peskin sufficiently to cover Peskin's liability for income tax thereon.

With a mutually acceptable price established, approval of the ordinance followed. At the October 30 meeting, Peskin, with Stulberg in attendance, presented the K & B position. In response, the local school board and several residents expressed opposition to the rezoning fearing that the increase in population resulting from the proposed development would overcrowd the schools. Nevertheless, the proposed ordinance rezoning the 320 acre parcel was approved. On November 14, the Board adopted the ordinance rezoning the 90 acre parcel.

Sometime between October 30 and November 30, Peskin paid Jenkins $35,000 in cash. Jenkins in turn distributed $5,000 to each of the other officials. Since the officials either declined to run for reelection or were defeated in elections the following April, the $35,000 balance was never paid. The transfer of the filling station site was never accomplished, though included in a Deutsch and Peskin bill to K & B as part of attorney fees (Jan. 27, 1969), and mentioned by Peskin to a K & B official in 1971.

Payment to Peskin was made by an Illinois subsidiary of K & B, as follows:

| | |
|---|---|
| Nov. 14, 1968 | $10,000. |
| Jan. 14, 1969 | $25,000. |
| Feb. 25, 1969 | $10,000. |
| April 10, 1969 | $55,000. |

On December 24, 1968, Peskin's partner Deutsch wrote two checks for $20,000 each to two young lawyers, ostensibly as fees. The payees cashed the checks, kept part for taxes, and returned the balance. Deutsch testified he did this in order to obtain $25,000 in cash for Peskin, who said he needed it for the village officials.

## II. THE TRAVEL ACT

### A. Count 5

Count 5 of the indictment charged that Peskin and the other original defendants caused Stulberg to travel from Detroit to Chicago on or about October 22, 1968 with intent to promote the unlawful activity of bribery and thereafter they performed acts to promote the carrying on of that unlawful activity in Illinois. Peskin asserts that since Stulberg came to Chicago for reasons in addition to his interest in the Hoffman Estates zoning, his travel was incidental to the bribery. However, section 1952 does not require that defendant's travel be solely in pursuit of criminal activity, *United States v. Gooding*, 473 F.2d 425, 428 (5th Cir. 1973), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155, and since Stulberg traveled to participate in the rezoning scheme, it cannot seriously be contended that his travel was incidental. Stulberg attended the meeting of the village Board October 24, at which the trustees appeared to change their direction to a favorable one. This meeting, and Stulberg's presence, could well be deemed very significant in bringing about the unlawful activity of bribery.

Peskin further argues that Count 5 is defective because Stulberg's travel cannot be attributed to him and there is no proof that he caused the travel. Unlike *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), the interstate travel at issue here was the travel of an essential, knowing and deliberate participant in the crime. It is well established that co-conspirators are responsible for the acts of their cohorts in furtherance of the crime. *United States v. Joyce*, 499 F.2d 9, 16 (7th Cir. 1974), *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306. Therefore, even apart from the

probability that Peskin requested Stulberg's presence in Chicago in order to attend the meeting, Peskin is liable for Stulberg's travel because it furthered their common purpose. *United States v. Chambers*, 382 F.2d 910, 913–14 (6th Cir. 1967). *See United States v. Lee*, 448 F.2d 604, 607 (7th Cir. 1971), *cert. denied*, 404 U.S. 858, 92 S.Ct. 107, 30 L.Ed.2d 100.

■ As an adjunct to his causation argument, Peskin contends that even though the indictment is couched in causal language, the failure to cite 18 U.S.C. § 2(b) precludes Peskin's conviction under section 1952 for what is essentially an aiding and abetting charge. This argument is clearly without merit. The indictment informed defendant of the offense charged. It alleged that he, and others, wilfully did cause Stulberg to travel. There was nothing misleading about the charge. Omission of a statutory citation is not fatal "if the error or omission did not mislead the defendant to his prejudice." Rule 7(c)(3), Fed.R. Crim.P.

There is no question but that Peskin acted to promote the intended bribery after the Stulberg travel.

### B. Counts 6–9

Counts 6, 7, 8 and 9 charged defendants with using and causing to be used facilities in interstate commerce with intent to promote the unlawful activity of bribery. The facilities were alleged to be various banks and the carrier system between Chicago and Detroit. In each count it was alleged that a check drawn upon a K & B account in a Detroit bank and payable to a K & B Chicago subsidiary was deposited in its account in Chicago; and that the check was transmitted from bank to bank until it reached the drawee bank in Detroit and charged to the K & B account. In each count it was charged that Peskin and others thereafter performed acts to promote the carrying on of the unlawful activity of bribery in Illinois.

The proof showed, as before stated, that Peskin was paid $100,000 by checks of the subsidiaries on four dates. These were in payment of billings by Peskin directed to Stulberg for attorney fees. In fact, the total sum was to cover the $35,000 Peskin paid the village officials, Peskin's income tax liabilities on the sum transferred, and his fee for services. On the day or the day after each of these checks to Peskin was drawn, one of the checks in these four counts was drawn and deposited. There was evidence that without such deposits, there were insufficient funds in the subsidiary's account to cover the checks drawn to Peskin. Thus it is clear that these K & B checks, and their interstate transmission in the process of clearing, were essential in transferring to Peskin the funds necessary to carry out the arrangements between Stulberg and himself. There is no evidence that Peskin was specifically aware of these checks. He contends on appeal that the use of interstate commerce facilities was minimal and incidental and therefore insufficient under the Travel Act, and, additionally, that the violation of state law was completed before such use.

We first treat the argument that the use of interstate facilities was minimal and incidental.

■ Although the Travel Act, 18 U.S.C. § 1952,[2] was enacted to combat

---

**2.** 18 U.S.C. § 1952 provides in pertinent part:

 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3) shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

organized crime, *United States v. Nardello,* 393 U.S. 286, 290–91, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), its language and scope are not so limited. *United States v. Archer,* 486 F.2d 670, 678–80 (2d Cir. 1973); *United States v. Phillips,* 433 F.2d 1364, 1367 (8th Cir. 1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 900, 27 L.Ed.2d 819; *United States v. Roselli,* 432 F.2d 879, 885 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828. Nevertheless, we are mindful that Congress did not intend "a broadranging interpretation of § 1952." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

■ Peskin argues that he neither knew of nor solicited the interstate transfer and that the source of the funds was immaterial to him as well as to the bribery. Citing *United States v. Isaacs,* 493 F.2d 1124 (7th Cir. 1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146; *United States v. Altobella,* 442 F.2d 310 (7th Cir. 1971); and *United States v. McCormick,* 442 F.2d 316 (7th Cir. 1971), he concludes that the use of interstate facilities to clear the Detroit checks was "minimal" and "incidental" and thus insufficient to invoke the Travel Act.

The transmission of funds to Mr. Peskin was essential to the carrying on of the illegal activity. Although he had advanced the first payments, others were contemplated, and no one would expect him to complete the plans if he were not reimbursed in the first instance. The deposit and interstate clearance of the Detroit checks were essential in fact to the payment of Peskin, though he and perhaps Stulberg were unaware of the details. We do not consider this use of interstate facilities "minimal" and "incidental" as those terms have been used in this context.

The significance of the use of interstate facilities in this case differs markedly from that in the cases relied upon. *Altobella* held that the clearance of an out-of-state check used by the victim of an extortion to raise cash with which to make payment even though followed by the distribution of the proceeds among the wrongdoers was minimal and insufficient to invoke federal jurisdiction. In *McCormick* an operator of a purely local gambling activity advertised for salesmen. A few of the newspapers containing the advertisements were mailed to out-of-state subscribers. This court held "there was no showing that defendant's lottery in any way depended upon or included interstate operations." *McCormick, supra,* 442 F.2d at 318. In *Isaacs,* three checks were drawn in Illinois on an Illinois bank, to distribute the proceeds of unlawful activity. They were deposited in Illinois banks, but cleared through the Federal Reserve Bank in St. Louis. Noting that checks which would have cleared through Chicago could just as easily have been utilized, the court held that the use of interstate facilities which in fact occurred "was so minimal, incidental, and fortuitous, and so peripheral to the activities" of defendants, that it was error to submit the counts to the jury. *Isaacs, supra,* 493 F.2d at 1146. *Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971) was a case where customers crossed a state line to patronize an otherwise local unlawful gambling activity of defendants. The Supreme Court held that, at least in the absence of a finding that defendants "actively sought interstate patronage," the interstate travel of the customers did not provide grounds for prosecution of defendants under the Travel Act.

Here, as already noted, the clearance of the Detroit checks was necessary in fact to complete reimbursement of Peskin for the bribe money he had advanced,

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

and such reimbursement furthered the contemplated later illegal activity.

■ That Peskin was not specifically aware of the interstate transfer is unimportant. The use of interstate facilities provides the basis for federal jurisdiction. The statute does not expressly provide that the defendant must knowingly use interstate facilities. *United States v. LeFaivre,* 507 F.2d 1288, 1297 (4th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762; *United States v. Hanon,* 428 F.2d 101, 108 (8th Cir. 1970) (en banc), *cert. denied,* 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122; *United States v. Bash,* 258 F.Supp. 807 (N.D.Ind.1966), *aff'd sub nom. United States v. Miller,* 379 F.2d 483 (7th Cir. 1967).

Considering the Act's purpose, it is plain that such a scienter requirement should not be implied. The statute was intended to assist local authorities in combating criminal activities that extend beyond the borders of one state. *United States v. Nardello,* 393 U.S. 286, 290–92, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). This purpose would be severely undermined if the statute were read to require that each participant, in order to be found guilty, must be proved to know in fact that interstate facilities were used.

Finally, the interstate scope of the unlawful activity is clear, and was known to Peskin. K & B carried on activities in several states. Peskin dealt with Stulberg in Detroit as well as in Chicago.

■ We next consider, as to each count, whether there was a so-called "thereafter act" with respect to the use of interstate facilities charged in each count.

In *United States v. Zemater,* 501 F.2d 540, 544 (7th Cir. 1974) we observed that to have violated the Travel Act a person

. . . must have 'used a facility in interstate commerce to facilitate the carrying on' of an illegal enterprise as defined by the statute 'and *thereafter* performed the carrying on' of the un-

lawful activity. (Emphasis in original.)

Peskin contends that since the village officials were paid the $35,000, apparently by cash advanced by Peskin, before the Detroit checks were issued in the process of reimbursing him, he performed no acts thereafter to promote the carrying on of the unlawful activity of bribery in Illinois.

The evidence does not make clear the date on which Peskin delivered the $35,000 cash to Jenkins. Such payment occurred either within two weeks before or after the use of interstate facilities charged in Count 6. It is clear that it occurred before the use of interstate facilities charged in Counts 7, 8 and 9.

Defendant's contention must be based on the view that the unlawful activity of bribery involved in the case terminated with the payment to Jenkins in November and distribution by him to the other recipients. This view overlooks the fact that after such payment there remained outstanding the promise of an additional $35,000 to be later paid, and of a transfer of real estate to Jenkins. Although neither of the latter was consummated, they were intended by the parties and would also have constituted unlawful activity. Until those intentions were abandoned, acts to promote or carry them on, or to facilitate their promotion or carrying on would be acts fulfilling the terms of the Travel Act.

Under this latter analysis, Peskin's acts in collecting reimbursement for the first-round payment would constitute acts to promote, carry on, facilitate or the like, since he could scarcely be expected to advance the second-round payment if not reimbursed for the first. In addition, Peskin had Deutsch arrange to generate $25,000 in cash which Peskin said was for the village officials. He may simply have been replenishing his supply of cash out of which he had advanced the first payment. Even so, such replenishment would be preparation for the agreed later payments. This transaction occurred after the use of inter-

state facilities charged in Count 6, and would be a "thereafter act" supporting that count.

Finally, there was evidence that in May, 1971, Peskin asked K & B to transfer the real estate promised to Jenkins. The jury could properly have viewed this request as an attempt to promote and carry on that part of the contemplated unlawful activity. So viewed, it would support conviction on counts 6, 7, 8 and 9 since the May, 1971 request occurred after all the uses of interstate facilities set forth in those counts.

Accordingly we sustain the convictions and sentences on Counts 6, 7, 8 and 9, as well as 5.

 We think, moreover, that even without the fact that further bribery was contemplated, the acts of Peskin in billing and accepting successive payments constituted acts facilitating the carrying on of the unlawful activity even though they occurred after the zoning had been changed and the bribe had been paid. The promise to reimburse Peskin was a necessary step in effecting the bribery. We do not think it strained to say that, even though reimbursement occurred after the bribe was received by the officials, it was part of the unlawful activity for the purpose of the Travel Act. See *United States v. Corallo*, 413 F.2d 1306, 1320 (2d Cir. 1969).[3] On this analysis Counts 6, 7 and 8 would be sustained and only the conviction on Count 9 would be vacated, since defendant was shown to have accepted reimbursement after each use of the interstate facilities other than the use charged in Count 9.

### III. THE SUPPRESSION MOTION

██ Prior to trial, Peskin moved to dismiss the indictment or, in the alternative, to suppress any statement made by him, evidence obtained from his accountants and evidence derived from these sources.[4] The theory of the motion was that from September 1972 on, Peskin was the subject of a criminal investigation; that this investigation was carried on under the guise of two civil income tax audits; and that the failure of Internal Revenue agents to inform him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) in the course of these audits violated his constitutional rights. After a lengthy hearing, the district court denied the motion.

Peskin relies on *United States v. Dickerson*, 413 F.2d 1111 (7th Cir. 1969), asserting that a taxpayer is entitled to *Miranda* warnings at his first meeting with Internal Revenue agents after he has become a criminal suspect, regardless of whether a formal criminal file has been opened. *Dickerson*, however, does not stand for such a sweeping proposition. That case only established the rule in this circuit that Internal Revenue agents must give *Miranda* warnings at the inception of the first contact with the taxpayer after the case has been transferred to the Service's Intelligence Division.[5]

---

**3.** Section 1952 refers to state law only to identify the unlawful activity in which the defendant is engaged. *United States v. Rizzo*, 418 F.2d 71, 74 (7th Cir. 1969), *cert. denied*, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260. The federal crime is the use of the interstate facilities in furtherance of the unlawful activity, not the violation of state law. *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970), *cert. denied*, 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141. There is therefore no requirement that the state crime ever be completed. *McIntosh v. United States*, 385 F.2d 274, 276 (8th Cir. 1967).

**4.** Much of the information examined by Mr. Radman was not protected by the Fifth Amendment rights of Mr. Peskin. Radman's audits were primarily directed at partnership returns and records. Mr. Peskin's general assertion that he cooperated and answered questions suggests a possibility that Radman may have obtained information suppressible if *United States v. Dickerson*, 413 F.2d 1111 (7th Cir. 1969) applied, but the existence or extent of that information or of any information ultimately obtained as a result was never explored because of the court's ruling now challenged.

**5.** In many cases, as in the case before us, Special Agents of the Intelligence Division may examine leads or discuss matters with their civil counterparts. In this context, referring to

Alternatively, Peskin contends that the warnings should have been given because the government intentionally delayed referral of the case to the Intelligence Division to avoid the *Dickerson* holding. This issue was reserved in *Dickerson's* companion case, *United States v. Habig,* 413 F.2d 1108, 1111 n. 4 (7th Cir. 1969), *cert. denied,* 396 U.S. 1014, 90 S.Ct. 559, 24 L.Ed.2d 506. Whether we must now reach it requires examination of the events leading up to the formal opening of the Intelligence Division tax case against Peskin.

The initial IRS contact with Peskin occurred during the summer of 1972. Revenue Agent Richard Hein was assigned to audit the 1970 partnership tax return of the law firm Deutsch, Peskin and Levy. Hein was neither told to look for nor did he discover any criminal activity.

At about that time, Assistant United States Attorney Anton Valukas was involved in a Grand Jury probe of the United States Department of Housing and Urban Development and K & B. During the probe Valukas heard allegations concerning Peskin and bribery in Hoffman Estates. He wrote the regional IRS director requesting the tax returns of Earl Deutsch, Paul Levy and Peskin for the years 1968, 1969, 1970, and 1971. In August and September the Grand Jury subpoenaed K & B to present checks written to Peskin or the law firm and other documents relating to K & B Transactions in Hoffman Estates, Palatine, and Matteson, Illinois.

In October, Valukas happened to have lunch with Special Agent Anders Flodin of the IRS Intelligence Division and several others. Flodin was involved in an investigation of the Cook County Assessor's Office and recognized Deutsch's name when Deutsch and Peskin were mentioned in conversation. In passing, Valukas mentioned that he had heard that Peskin had received a $100,000 fee for the K & B Hoffman Estates rezoning and that Peskin had been conveyed a gasoline station site for transfer to the village mayor. Since Flodin was interested in Deutsch, Valukas sent Flodin canceled checks from K & B Homes, Inc. payable to Deutsch & Peskin and the billing statements for the $100,000 fee.[6]

Shortly thereafter, Flodin evaluated the information available to him and decided that it had "no intelligence division potential." Believing that there might be a need for a civil tax adjustment, he turned the material over to Paul Berwick, Group Manager, Audit Division, and gave him some background information on Deutsch. Berwick assigned Revenue Agent Melvin Radman to audit the 1969, 1970, and 1971 returns of the Deutsch & Peskin partnership and the returns of the individual partners. Berwick's primary concern was that if the partnership received the gasoline station site, the real estate might have been inaccurately valued for tax purposes.

In January 1973, Agent Radman commenced the audit. He explained to the firm's accountant that the reaudit of the 1970 return was necessary to examine the firm's capital accounts.[7] Radman

---

what *Dickerson* found to be the crucial step as "the transfer of the case to the Intelligence Division" may be somewhat misleading. It is perhaps more accurate to refer to the critical event as the formal opening of the Intelligence Division criminal case.

6. During the fall of 1972, Valukas had a conversation with Special Agent Paul Neuhauser, a Group Manager in the Intelligence Division, in which Valukas mentioned the $100,000 payment to Deutsch & Peskin and that he had requested the IRS to disclose the relevant tax returns. Anticipating that disclosure would be granted, Neuhauser gathered the returns for

the partnership and the partners for the years 1968–1972. After scanning the returns and seeing nothing unusual, Neuhauser asked Valukas if he could see the checks and K & B invoices. Valukas told him they were in Flodin's possession. Neuhauser then saw Flodin and examined the checks. Flodin told Neuhauser he was going to refer the information to Audit Division, and Neuhauser dropped the matter.

7. By so representing the purpose of the audit, Peskin contends, Radman intentionally misled the taxpayer and obtained evidence by fraud and deceit. We recognize that "appellate

worked on the audit intermittently over the first six months of the year, but nevertheless spent considerable time on the project. He had no contact with the U. S. Attorney's Office concerning the audit, but he had several meetings with Flodin (apparently by chance) during which the Deutsch & Peskin audit was mentioned.

On April 3, Special Agent James Swanson of the Intelligence Division was in Assistant U. S. Attorney Valukas' office on an unrelated matter. Valukas received an anonymous telephone call, and Swanson took the phone. The caller implicated K & B, the Deutsch & Peskin firm, and the Hoffman Estates officials in a zoning bribery scheme. Valukas indicated that this information corroborated other allegations he had heard. Swanson informed his supervisor, Group Manager Neuhauser, and set out to confirm the charges. He first investigated the village officials, and cases were formally opened against them in June.

In late May or early June, Swanson became aware of the Radman audit. He visited Radman and received the Hoffman Estates-K & B rezoning file that Flodin had given Berwick. This was the first time Radman had met Swanson. In late June, Swanson was informed that Stulberg was about to make a statement implicating Peskin and immediately advised Berwick to discontinue contact with Peskin until Stulberg's story was verified. Berwick notified Radman.

In September Earl Deutsch was granted immunity and agreed to testify concerning the firm's checks to attorneys ostensibly in payment for services, but actually to generate cash for Peskin. At this point Agent Swanson indicated there was probable cause to believe that Peskin violated the tax laws, and the Intelligence Division formally opened the case. When Swanson confronted Peskin

on October 1, 1973, he gave Peskin the *Miranda* warnings.

Whatever may be the rule when the IRS purposefully delays referral of a tax case to the Intelligence Division, the evidence does not support a finding that the government intentionally avoided compliance with *Dickerson* in this case. See *United States v. Esser*, 520 F.2d 213, 216 (7th Cir. 1975). In the first place, through the first six months of 1973, any thought of possible prosecution had not sufficiently focused on Peskin to necessitate the giving of *Miranda* warnings under the rationale of *Dickerson*. Flodin's interest was Deutsch, not Peskin, and Berwick's interest was in a civil audit of the returns. The fact that Flodin discarded the Deutsch-Peskin file as being without intelligence potential runs counter to any notion that "the investigative machinery of the government [was] directed toward the ultimate conviction of a particular individual and [the] suspect should [have been] advised of his rights." *United States v. Dickerson, supra*, 413 F.2d at 1115, *citing United States v. Turzynski*, 268 F.Supp. 847, 852 (N.D.Ill. 1967). *See United States v. McCorkle*, 511 F.2d 482, 487–89 (7th Cir. 1975) (en banc).

After the April 3 telephone call in Valukas' office, Swanson set out to corroborate the charges of bribery in Hoffman Estates, first investigating the trustees, then turning to Deutsch & Peskin. When Stulberg's statement further implicated Peskin, Radman was told to terminate contact with the taxpayer. It was not until Deutsch's September statement revealing the spurious attorney fee payments that there was a firm basis for a tax fraud case.

The evidence does not support the contention that Radman's civil audit was a subterfuge in a criminal investigation conducted by either the Intelligence Di-

court cases dealing with fraud in tax situations warn that revenue agents must not affirmatively mislead a taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal consequences . . . ." *United States v. Lehman*, 468 F.2d

93, 105 (7th Cir. 1972), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232. Peskin's contention, however, is unpersuasive, since the evidence does not support the view that Radman was conducting something other than a civil audit.

vision or the U. S. Attorney's Office. Radman knew nothing of the U. S. Attorney's investigation, and Swanson was not aware of the civil audit until late May, 1973 at the earliest. In short, although defendant urges that there must be more than mere coincidence in the fact that the audit proceeded as it did after and during various expressions of interest in rumors of bribery by Mr. Peskin, the record fully supports the district court's observation, denying the motion to suppress:

> At the time of the Radman audit, the total government investigation, both the U. S. and the Intelligence Division, had not yet focused on Peskin to the extended [degree] required to demand the *Miranda* warnings, under the rules, and even the more rigid rules set down in the Dickerson case. I think I must take note from the evidence I heard that the background of this case reveals a rather intensive investigative activity of several areas of suspected wrongdoing, and that the evidence ultimately utilized to obtain the indictment against Mr. Peskin could almost be characterized as an accidental by-product of other investigations. And it does seem that in the course of the other investigations, as random facts came to the attention of the U. S. Attorney, or the Intelligence Division, and as information was exchanged, that they more or less put these random pieces of information on the shelf, and that is certainly the basis for suspicion. But they were probably not, or at least did not in the minds of the government seem to be the basis for a conclusion that they had criminal activity on the part of an individual defendant such as to justify an intensified investigation. When that conclusion was reached, and the case was referred as a fraud case, it was done at a date subsequent to the Radman investigation and the information that he had obtained.

## IV. EXTORTION DEFENSE

Several claims of error relate to the so-called extortion defense. Actually the defense so referred to was an effort to raise a reasonable doubt as to Mr. Peskin's intent to influence official conduct.

Under the Travel Act the relevant definition of bribery for this case is Ill. Rev.Stat., Ch. 38, § 33–1(c), providing that one commits bribery when

> with intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee or juror, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept . . . .

Defendant apparently hoped to prove that the merits of the K & B plan were so compelling that K & B had a virtual right to the change in zoning it sought; that the village officials uniformly exacted money for zoning changes; and that their demand of money of K & B for the change it sought constituted extortion such that compliance with the demand either could not be bribery as a matter of law, or at least a jury might entertain a reasonable doubt of the intent essential to bribery.

Defendant complains of limitations imposed by the district court on his proof of the merits of the plan and the past pattern of demands of the village officials for money, and of an instruction limiting the defense of extortion to one that is so overpowering as to negate criminal intent or wilfulness.

### A. Merits of the K & B Proposal

Defendant offered proof that the K & B project compared favorably to similar developments approved by the village. The comparisons were made with respect to density per acre, school children per acre, and tax base per child. These related to some of the bases for opposition to the project made evident at the zoning board and trustees' meetings.

■ A trial judge has discretion to keep a trial within reasonable bounds by excluding evidence of marginal relevance, *United States v. Conrad*, 448 F.2d 271, 274–75 (9th Cir. 1971). The testimony as to statements at the meetings

showed favorable expressions as well as opposition. Counsel was able to elicit favorable figures during cross-examination of Stulberg. A zoning change is a decision of a discretionary or legislative type, and the evidence in the record made it very improbable that further evidence would have conclusively shown that the plan was in the community's best interests as of the date of the zoning hearings. Without intimating any conclusion that the evidence would be relevant if it could have so shown, we do conclude that in any event there was no abuse of discretion in excluding additional evidence on the plan's merits. *United States v. Gorman*, 393 F.2d 209, 212 (7th Cir. 1968), *cert. denied*, 393 U.S. 832, 89 S.Ct. 102, 21 L.Ed.2d 103.

## B. Prior Similar Payments Received by Hoffman Estates Officials

■ The district court permitted defendant to ask each village official who testified whether he had "ever received money which came from other builders for [his] vote on zoning matters." Each one said he had.[8] We intimate no conclusion as to whether defendant was entitled to this question and answer.

The court rejected, however, an offer to prove by these and other witnesses that there had been a pervasive and systematic pattern of payments for zoning in Hoffman Estates, the court noting, among other reasons, that there was no showing this pattern was known to Peskin.

Permission to the defense to proceed with the offer of proof would have prolonged the trial, and would have introduced the details of a substantial number of unrelated transactions. At best for defendant, the probative value of these payments in other instances is open to question. As the Second Circuit recently observed: "Almost every bribery case involves at least some coercion by the public official; the instances of honest men being corrupted by 'dirty money,' if not nonexistent, are at least exceedingly rare." *United States v. Kahn*, 472 F.2d 272, 278 (2d Cir. 1973), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958. Accordingly, evidence that the officials previously, or on this occasion, demanded money carries little weight in a case such as this.

In view of these considerations and our review of the record, we conclude there was no abuse of discretion in the rejection of the offer of proof.

## C. Instruction as to Extortion Defense

■ The district court instructed the jury on the relationship of an official demand for money and the intent required for conviction of bribery, as follows:

If you find that the public officials named in the indictment communicated a threat to the defendant that unless paid they would take action as public officials against Kaufman and Broad's zoning proposal, you may consider this in determining whether the defendant intended to commit bribery.

---- and further ----

In determining whether the defendant was a victim of extortion, such as to negate his alleged criminal intent to bribe, it is relevant, but not controlling, whether Peskin or Jenkins first raised the question of money. *Unless the extortion is so overpowering as to negate the criminal intent of wilfullness, it is not a total defense to bribery charges.* (We have italicized the portion of the instruction particularly objected to.)

There appears to be no Illinois authority to support a proposition that any particular degree of pressure by an official demanding money in return for the performance of an official act is a defense

---

8. Although the phrasing differed, this was the sense of the questions put to Meyer, Sloan, and Noble. Mayor Jenkins was asked whether he had ever received a bribe in his capacity as a village official. The government later stipulated that if Jenkins was asked a question similar to the questions posed to the trustees, he would respond, as they did, affirmatively.

to a charge of bribery in Illinois. This being true, it seems to us that at least in a case like the instant one where a discretionary or legislative decision on zoning has been requested, the withholding of such action until a money demand is met could not negate the intent (to influence the performance of an official act) required by the Illinois bribery statute. Thus the challenged portion of the instruction is not reversible error. Its language was taken almost verbatim from the observation of the court in *United States v. Kahn, supra,* 472 F.2d at 278.

## V. EVIDENCE OF A SUBSEQUENT BRIBE

Prior to resting his case, Peskin's attorney requested a ruling on whether the government would be able to cross-examine Peskin, if he took the stand, about the alleged payment of money to a public official in return for favorable treatment of a K & B development two years after the Hoffman Estates transaction. The district court ruled that the evidence was relevant and that the government could inquire into the incident. Rather than risk exposure of this evidence, Peskin decided not to testify. He argues that the district court's ruling was wrong as a matter of law and under the facts of this case denied him a fair trial.

Evidence of other crimes and misconduct is relevant if it bears upon intent, knowledge, or absence of mistake or accident. *United States v. Jones,* 438 F.2d 461, 465 (7th Cir. 1971); *United States v. Marine,* 413 F.2d 214, 216–17 (7th Cir. 1969), *cert. denied,* 396 U.S. 1001, 90 S.Ct. 550, 24 L.Ed.2d 493. *See* Fed.R.Evid. 404(b), Act of January 2, 1975, Pub.L. No. 93–595. Evidence of the subsequent payoff was admissible on that theory absent a showing of overriding prejudice or remoteness. *United States v. Barash,* 412 F.2d 26, 30–31 (2d Cir. 1969), *cert. denied,* 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82. We think that it was not an abuse of discretion to rule that this incident was a proper subject for cross examination. *Cf. United States v. Kahn, supra,* 472 F.2d at 282.

## VI. HAYTER AND FAUBIAN TESTIMONY

Peskin also asserts that the testimony of Virginia Hayter and Royal Faubian was irrelevant and prejudicial. Hayter, as president of the local school board, attended the Trustees' meeting at which the K & B rezoning was debated and approved on October 30, 1968. Hayter testified to a conversation she had with Peskin during the meeting: He asked, "What will it take to make you happy?"; and when she turned away indignantly, he stated, "This is going through." This testimony can be taken to mean that Peskin was opening the subject of a payment to her for withdrawal of opposition and that he knew before the vote was taken that the rezoning's passage was a foregone conclusion. So construed, it was damaging, but that does not make it inadmissible. Though the remarks were somewhat ambiguous, they were relevant evidence for the jury to weigh and consider.

Faubian, a former officer of K & B, testified concerning a meeting he had with Peskin in 1971. During the meeting Peskin cautioned Faubian that he may be shocked by what he was to hear but to keep it confidential. Peskin then related that considerable funds had been paid to officials of Hoffman Estates for favorable zoning and that the gasoline station site, which was apparently part of the deal, had not been transferred to the village mayor. We fail to see how it can be argued that this damaging admission is irrelevant and reject Peskin's claim on this point as meritless.

## VII. MISCELLANEOUS

### A. Coerced Verdict

After the jury had deliberated two and one-half days, the trial judge informed counsel that he intended to dismiss the jury if it had not reached a verdict by 10:00 P.M. At about 9:30 P.M. he indicated to counsel that he in-

tended to ask the jurors if they had reached a verdict or, if they had not, whether they could within the next few minutes. The jury was then brought into court, and the following exchange occurred:

THE COURT: . . . My first question is—and I gather that we all know the answer to this—have you yet reached a verdict as to all the counts in the indictment?

FOREMAN BROWN: No.

THE COURT: You have not. All right.

Do you think that if you were allowed to deliberate, let's say, another half hour—and I don't intend to keep you in there any longer than that— you might reach a verdict as to all of the counts in the indictment?

FOREMAN BROWN: Yes.

THE COURT: You believe that you are close to a verdict on the complete indictment then?

FOREMAN BROWN: Possibly.

THE COURT: Now let me ask all the members of the Jury, by a show of hands, to tell me, do you think it would be profitable and possible to reach a complete agreement on all counts of the indictment if you deliberated until 10:00 o'clock? How many would think it would be worthwhile to do that? Show of hands?

Well we will do that then. If you will retire again, we will call you out again at 10:00 o'clock.

■ Peskin argues that the judge's statements were coercive, coercing the jurors to hurry their decision and denying him his right to a carefully considered verdict. Defense counsel did not object when the statements were made, and given a timely objection the judge could have readily cured any perceived prejudice. Therefore, unless the statements can be said to be "plain errors or defects affecting substantial rights," Peskin has waived his complaint. Fed.R. Crim.P. 52(b).

■ Communications between judge and jury must be handled with particular care, and statements suggesting that the jury reach a quick verdict at the expense of a thoughtful verdict are to be deplored. The jury here had twice been given general instructions on presumptions and burdens and told, in accordance with *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc), that they should not surrender honest opinions as to the weight of the evidence "for the mere purpose of returning a verdict." The judge's statements, moreover, were ambiguous. He did not say that a verdict must be reached by 10:00. Although we know from his statement to counsel that he planned to discharge the jury if it failed to reach a verdict by 10:00, the jurors may have reasonably interpreted his statement that he would send them to their hotel rooms in preparation for another day's deliberations.

■ Failure of counsel to object, aside from its effect as waiver, is probably evidence that interpretation of the remarks as coercive would be a strained rather than a natural interpretation. Considering these factors as well as the length of the jury's deliberations, we do not believe that the judge's comments "could have persuaded a juror entertaining a conscientious conviction that the defendant's guilt had not been proved to surrender it as a matter of expediency." *Smith v. United States*, 188 F.2d 969, 972 (9th Cir. 1951); *Glazerman v. United States*, 421 F.2d 547, 554 (10th Cir. 1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 90.

### B. Selective Enforcement

Relying on *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) (en banc), Peskin next argues that he was the victim of selective enforcement of the laws and that the district court erred in refusing to grant a hearing on this claim. Peskin, a former member of the Illinois General Assembly, charges that he was prosecuted because he was politically prominent and newsworthy; that others who

participated in the bribery were not prosecuted; and that the usual practice of the United States Attorney's Office was to prosecute the officials who received payoffs, not go-betweens like Peskin.

A selective prosecution defense invokes the equal protection component of the Fifth Amendment's due process clause. Fundamental to the defense is proof that the decision to prosecute was based on impermissible considerations such as race, religion, or the desire to penalize the exercise of constitutional rights. *United States v. Swanson*, 509 F.2d 1205, 1208 (8th Cir. 1975); *United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974). In *Falk* we held that a defendant is entitled to a hearing on this issue when he "alleges intentional purposeful discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's purpose. . . ." 479 F.2d at 620–21. In the absence of such a showing the weighty presumption of the legality of the prosecution remains unshaken. Mere "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446, 453 (1962).

Unlike *Falk* where there were facts alleged which colorably showed that the prosecution was undertaken with the motive to suppress dissent against the war in Vietnam, Peskin has not alleged a *prima facie* entitlement to a hearing. Assuming that the decision to indict Peskin and press for trial was based in part on consideration of his political prominence, this is not an impermissible basis for selection. It makes good sense to prosecute those who will receive the media's attention. Publication of the proceedings may enhance the deterrent effect of the prosecution and maintain public faith in the precept that public officials are not above the law.

### C. Tax Count Instruction

Peskin was charged in separate counts with income tax evasion and making a false statement on the 1968 partnership return. He was only convicted on the false statement count. In his reply brief he argues error in the following instruction:

A defendant's knowledge of the contents of the tax return may be inferred from the facts and circumstances of the case, and the signature at the bottom of the tax return is prima facie evidence that the signer knew the contents thereof, which is to say, that unless and until outweighed by evidence in the case which leads you to a different or contrary conclusion, you may find from the defendant's signature at the bottom of his respective return that he had knowledge of the contents of that return.

This instruction was given on the element of willfulness on the tax evasion count. He was acquitted on this count, but willfulness is also an element of the false statement count.

The phrasing may be subject to criticism since it suggests that evidence must be introduced to outweigh the inference of knowledge permissible from the signature. The instructions on the false statement count, however, indicated that carelessness or inadvertence was a defense. Reasonable doubt instructions were also given. Taking the instructions as a whole we find no likelihood that the jury felt compelled to infer knowledge from the signature, and no reversible error. *See also United States v. Bass*, 425 F.2d 161, 163 (7th Cir. 1970); *United States v. Harper*, 458 F.2d 891, 894 (7th Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1772, 32 L.Ed.2d 132.

### D. Sentencing Disparity

Lastly, Peskin contends that the disparity between his sentence and the sentences received by those who pleaded guilty indicated that he was penalized for exercising his right to a jury trial. Peskin received three years in prison on each count, the sentences to run concurrently. Other participants in the bribery transaction received sentences ranging from six months to two years.

■ A sentence which reflects punishment for a defendant's availing himself of his right to trial will be set aside, *United States v. Wiley*, 278 F.2d 500 (7th Cir. 1960), but a disparity between a sentence imposed on a defendant who pleads guilty and on another who is convicted after trial is not, standing alone, enough to establish that the latter has been punished for exercising a constitutional right. *United States v. Wilson*, 506 F.2d 1252, 1259–60 (7th Cir. 1974).

■ The trial judge commented at the time of sentencing on factors which he felt spelled out greater culpability for Mr. Peskin than his codefendants. We have no reason to find an abuse of discretion.

The judgment appealed from is affirmed.