UNITED STATES of America, Plaintiff-Appellee,

v.

Walter A. NIEMIEC, Defendant-Appellant.

No. 79–1462.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1979.

Decided Jan. 2, 1980.

---

**10.** The Administrator had authority to so delegate duties. *See* 42 U.S.C. § 3752 (1976).

James F. Stanton, Merrillville, Ind., for defendant-appellant.

Richard A. Hanning, Asst. U. S. Atty., Hammond, Ind., for plaintiff-appellee.

Before SWYGERT and WOOD, Circuit Judges, and ACKERMAN, District Judge.*

ACKERMAN, District Judge.

Defendant Walter A. Niemiec appeals from his conviction by a jury of making perjurious statements to a grand jury in violation of 18 U.S.C. § 1623. He was sentenced to one year imprisonment and fined $3,000. During the period covered by the indictment, defendant was employed as the Chief Probation Officer and later as Court Administrator for the East Chicago City Court in Indiana. The charges arose out of defendant's alleged extortion of payments from Robert Klagstad, a bail bondsman, for the exclusive authority to write bonds in East Chicago.

Count I of the four count indictment charged defendant with extortion under 18 U.S.C. § 1951; Counts II and III charged defendant with filing false income tax returns for the years 1972 and 1973, respectively; Count IV contained the perjury charge. Defendant was acquitted on Counts I through III. He appeals his conviction on Count IV on various grounds.

## I. DUE PROCESS VIOLATIONS

The defendant first argues that he was denied due process of law through a series of governmental "improprieties." Defendant contends that he was selectively prosecuted by the government in bad faith. This argument is premised on the fact that the government's main witness, Klagstad, was an admitted forger and briber, yet the government failed to prosecute him.

A selective prosecution defense involves the equal protection component of the Fifth Amendment's due process clause. *United States v. Peskin*, 527 F.2d 71, 86 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). The allegation made by defendant here falls far short of what is necessary to prove such a defense. In *Peskin*, we stated that fundamental to such a defense is "proof that the decision to prosecute was based on impermissible considerations such as race, religion, or the desire to penalize the exercise of constitutional rights." 527 F.2d at 86, *citing United States v. Swanson*, 509 F.2d 1205, 1208 (8th Cir. 1975); *United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974). Absent such a showing, the presumption that a criminal prosecution is undertaken in good faith and in a nondiscriminatory manner, *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (en banc), remains undisturbed. *Peskin*, 527 F.2d at 86. It is settled that mere "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).

The defendant here does not allege any impermissible basis for his prosecution. He merely asserts that the government's witness was a wrongdoer who was not prosecuted. Such an allegation is insufficient to constitute a defense.

Next, defendant suggests that he was denied due process because the prosecutor, through his questioning, induced Klagstad to change his testimony before the grand jury to comport with the government's theory of the case. An examination of this testimony reveals that there is no merit to defendant's contention.[1]

* The Honorable J. Waldo Ackerman of the United States District Court for the Central District of Illinois is sitting by designation.

1. Q. And what was your relationship with Walter Niemiec at this time?
A. I was . . . Oh, I was, of course, out of business in East Chicago.
Q. How did that come about?
A. They cut us off for having some bonds in there that were . . . cut me off for having bonds in there that weren't powered, and placed Mr. Kokot with another company.
Q. All right. But in fact you had had a lot of bonds there that weren't powered?
A. That's right.
Q. That wasn't the reason?
A. That wasn't the reason.
Q. What was the reason?
A. I couldn't pay off anymore.
Q. And were you then subsequently cut off as a bondsman in East Chicago?
A. I was.

Defendant also complains of two letters written by the government on behalf of its witness Klagstad with knowledge of Klagstad's questionable character. Although one of the letters, a letter of recommendation, may have been ill-advised, letter-writing in itself on the behalf of a government witness does not affect the defendant's due process rights.

■ Defendant claims that his examination before the grand jury, which formed the basis of the perjury charge, did not comply with the standards established by the Supreme Court in *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). In *Bronston*, the Court found that precise questioning was a necessary predicate to the offense of perjury. There, the defendant had given a literally true but unresponsive and misleading answer before the grand jury. The Court stated that an unresponsive answer should be remedied by precise questioning and not by a federal perjury prosecution. On the contrary, the questioning which defendant challenges was direct and precise and the defendant's answers were responsive.[2] Thus, the *Bronston* standard was not violated. In sum, we find no infringement of defendant's due process rights as a result of these allegations.

## II. INCONSISTENT VERDICTS

■ Defendant also challenges his conviction on the perjury count as inconsistent with his acquittal on the extortion and tax counts. The indictment charged defendant with seven false statements. Arguably, five of these statements related to the charges on which defendant was acquitted. Those are: (1) that defendant had never received payments from Klagstad for the exclusive right to write bonds in East Chicago during 1972 through 1974; (2) that defendant had never received any money from Klagstad during 1972 through 1974 relating to his responsibilities in writing bonds for the City Court in East Chicago; (3) that Klagstad never made regular payments to defendant in cash for the exclu-

sive right to write bonds in East Chicago during 1972–1974; (4) that Klagstad did not ever deliver money to defendant in a plain white envelope for the purpose of being able to write bonds in East Chicago; (5) that during 1972 and 1973, Klagstad was not required to pay defendant 50% of his charge of the premiums on bonds that were written in East Chicago and that no such payments were made on a weekly or bimonthly basis.

However, two statements could have served as the basis for the conviction: (1) that defendant had no direct information or awareness of payments made by Klagstad to police officers for referring arrestees to Klagstad for bonds; (2) that defendant did not have personal knowledge of the existence of fraudulent bonds, powers and bond papers filed in the City Clerk's office. See discussion at part III *infra*. Thus, the perjury conviction was not necessarily inconsistent with the defendant's acquittal on the other counts.

■ Additionally, we have held that inconsistent verdicts are permissible since a jury may be acting out of compassion or compromise and not because they are unconvinced of guilt. *United States v. Serlin*, 538 F.2d 737, 747 (7th Cir. 1976); *United States v. Greene*, 497 F.2d 1068, 1085–86 (7th Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Tankersley*, 492 F.2d 962, 968–69 (7th Cir. 1974). *See also Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Fox*, 140 U.S. App.D.C. 129, 132 n.22, 433 F.2d 1235, 1238 n.22 (D.C.Cir. 1970); *United States v. Carbone*, 378 F.2d 420, 422–23 (2d Cir.), *cert. denied*, 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262 (1967).

## III. INSUFFICIENCY OF EVIDENCE

Defendant challenges the sufficiency of the evidence to sustain his conviction. The thrust of his argument is that since his conviction resulted from Klagstad's testi-

**2.** *See* testimony set forth at p. 1211 *infra*.

mony and Klagstad was a discredited, unbelievable witness, the conviction cannot stand.

■ Such an allegation requires us to view all of the evidence in the light most favorable to the prosecution, considering the jury's right to weigh the evidence and determine credibility. *United States v. Cardi*, 478 F.2d 1362, 1368 (7th Cir.), *cert. denied*, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973). We will not reverse a jury's decision if there is substantial evidence to support it. *United States v. Page*, 580 F.2d 916, 919 (7th Cir. 1978).

■ Even if defendant's contention that his conviction could have been based on only two of the seven statements contained in the indictment is accepted, there was sufficient evidence to sustain his conviction. His testimony before the grand jury was as follows:

Q. Has it been brought to your attention, or are you aware of the fact that payments were made by Robert Klagstad to officers of the East Chicago Police Department for referring individuals who are placed under arrest to him for bonds?

A. There was all kinds of talk on something like that, but no way was I able to find this out and I looked around, because if I would have, he would have been out on his ears.

Q. All right.

A. Because that would be my recommendation to the Judge.

Q. So you're indicating that you had no direct information that this was occurring, although you did hear things about this?

A. Yes, sir.

Q. Who did you hear things about this from?

A. I couldn't recall now because so many things—in other words, somebody would come by and maybe they would—maybe they were guessing sometimes or something, and I didn't pay attention to who they were for a specific identification purpose.

The defendant unequivocally stated that he was unable to determine whether Klagstad was paying police officers for referring arrestees to him (Klagstad) for bonds. Yet, a taped conversation between Klagstad and Niemiec demonstrates Niemiec's direct knowledge of such payoffs.[3] Other portions

3. Mr. Klagstad: Well, he's keeping his act clean.
Mr. Niemiec: He better be and they're [referring to police officers] putting pressure on him. They want to drop and all of that stuff. Hey, he's got a choice, right?
Mr. Klagstad: Do you remember how they squacked when we reduced them from what, $35 on what was it? What were they getting?
Mr. Niemiec: $10.
Mr. Klagstad: Yeah, 10, well, we have 15 over 50.
Mr. Niemiec: Yeah.

. . . . .

Mr. Klagstad: You know what pissed me off about that son of a bitch? [Referring to a police officer.] Tell you the trick he tried to pull on me. Remember when we had the $10 and $15 deal?
Mr. Niemiec: Umhmmm.
Mr. Klagstad: And I gave the bread to you? And then he come in yelling and screaming. He says I ain't giving you no more bonds one day. I says how come? He says, here, I want to talk to you in the kitchen. So he pulls me back in the kitchen. He says, we

ain't getting no money. I says I don't, you know I, you know, he says we're supposed to get our money out of Walter, he said, and he ain't paying us. Well, I happen to know that I had just made a disbursement and I know that, he says, we're $100 short this month. He says, I want that $100 in here before you get any more bonds. I says, I'll look into it. I never says, I says, hey, it's all taken care of. If you didn't get your half, your buddies screwed you out of it. Because, I says, I know that it was taken care of, you know. They were always doing that. They were saying you didn't pay them. Of course, I still do owe you, I think $199 on that deal.
Mr. Niemiec: Oh, Bob, how much do you owe me?
Mr. Klagstad: I think you were—
Mr. Niemiec: How much do you owe me?
Mr. Klagstad: I think you were out a little money on that deal.
Mr. Niemiec: Aw.
Mr. Klagstad: But that, you know, they were always trying, and then they'd call me back in there and they'd say now—
Mr. Niemiec: Tell me how much I'm—10,200 I got coming, Bob.

of the conversation reveal Niemiec's knowledge of the existence of fraudulent bonds. The tape was admitted into evidence and the jury properly could consider it in determining whether Niemiec perjured himself before the grand jury.

### IV. SENTENCING BY SUCCESSOR JUDGE

 Lastly, defendant contends that he was improperly sentenced by a successor judge. The trial judge, Judge McNagny, was unable to impose sentence due to illness and subsequent surgery. Defendant argues that because the trial lasted for one and one-half weeks and there were numerous witnesses whose credibility and demeanor were important factors in the jury's decision, he should have been granted a new trial when the presiding judge became unavailable for sentencing. We disagree.

Rule 25(b)[4] of the Federal Rules of Criminal Procedure provides that another judge may perform the duties required to be performed after a verdict or finding of guilt when the trial judge is unable to do so. It is within the sentencing judge's discretion to grant a new trial if he feels unable to perform the remaining duties because he did not preside at the trial. The defendant has failed to demonstrate that the successor judge, Judge Eschbach, abused his discretion.

This case was particularly proper for disposition by a successor judge. Contrary to defendant's characterization, this case was not complex. Judge McNagny, who had heard all of the testimony, ruled on defendant's post-trial motions for relief. Judge Eschbach, prior to sentencing, reviewed the files and records in the case, including the presentence report, and had met with the same sentencing council that had consulted with Judge McNagny regarding the proper disposition of this matter. *See* order dated

April 27, 1979. Judge Eschbach conferred with Judge McNagny and indicated that the sentence imposed was in accord with that which Judge McNagny desired to be given. Lastly, defendant was sentenced to far less than the statutory maximum allowable. In these circumstances, no abuse of discretion has been shown.

Consequently, for the reasons stated above, the judgment appealed from is affirmed.

---

4. Rule 25(b) provides:
 (b) After Verdict or Finding of Guilt. If by reason of absence, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.