**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Yehuda DRAIMAN,
Defendant-Appellant.**

**No. 85–1995.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1985.

Decided Feb. 21, 1986.

Patrick A. Tuite, Patrick A. Tuite, Ltd., Chicago, Ill., for defendant-appellant.

Michael J. Shepard, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, WOOD and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The defendant, Yehuda Draiman, a principal stockholder, attempted to take advantage of the burglary of Electro Video Marketing ("EVM") which occurred in Chicago, Illinois in August, 1981. Thereafter, Draiman filed on behalf of EVM two burglary insurance claims with the insurers, Transamerica and Hartford Insurance Companies. The government alleged that the insurance claims were fraudulent, being far in excess of actual losses, and charged Draiman with ten counts of mail fraud, two counts of obstruction of justice, and one count of perjury. A jury found Draiman guilty of the mail fraud counts, and not guilty of perjury. The government moved to dismiss the two obstruction charges upon which the jury had not reached a verdict.[1] This appeal followed raising the issue of whether the evidence was sufficient to show whether Draiman caused the mailings and whether they were in furtherance of Draiman's scheme to defraud the insurers. In addition, a variety of evidentiary rulings are questioned. We affirm.

## Facts

EVM, as the name suggests, was in the video business, and had on hand a stock of video tapes and equipment. It is not disputed that two burglars broke into EVM on August 15, 1981, and left with EVM property. The government alleges that the loss was of about 1,100 video tapes valued at about $25,000, plus two wastebaskets which likely were handy containers for the burglars' use. Draiman, however, had more grandiose ideas about the extent of his loss, and in October, 1981 filed insurance claims totalling $1,061,900.51, which included tapes, equipment, and a $10,000 cash loss which Draiman said had been left in a desk drawer. A month later EVM's adjuster revised the claim downward to $896,103.89 and there were other downward adjustments during the course of the insurance investigation, but never to within range of the government's evidence of actual loss.

Draiman elaborately falsified documents from a nonexistent company to show he had video stock which was stolen, but which in fact he never possessed. He prevailed on friends to prevaricate. Immediately after the burglary he estimated his loss in the same amount the government used for its purposes, but after that the claimed loss went up. He attempted to bribe the investigating officers. Employees discounted his claims of what was missing as they saw the merchandise undisturbed on the shelves and in storage areas after the robbery. If the burglars managed to haul out everything Draiman claimed they did, then the burglars were master burglars who made remarkable use of two wastebaskets.

On appeal Draiman points out that nine of the mailings upon which nine counts of mail fraud are based are letters from a lawyer in the firm representing the two insurance companies addressed to various persons involved with the claims other than Draiman. The remaining mailing which

---

1. Draiman was sentenced to four years incarceration on Count I, to be followed by five years probation on Counts II through X.

forms the basis of Count 8 is a letter from the attorney for EVM to the attorney for the insurance companies. Draiman argues that the mailings do not come within the scope of the mail fraud statute[2] as the government's proof failed to prove that (1) the defendant caused the mailings, and (2) that the mailings were for the purpose of executing the scheme. *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). The evidence will be considered in more detail as the issues are considered.

### Sufficiency of the Evidence

■ Draiman does not find fault with the trial court's mail fraud instructions, only with the sufficiency of the evidence on the components of mail fraud. Our standard of review requires that the evidence be viewed in the light most favorable to the government in determining whether *"any* rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Roman*, 728 F.2d 846, 857 (7th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). In reviewing sufficiency of the evidence at this distance from the trial we must give deference to the jury's weighing of the evidence and its drawing of reasonable inferences. *United States v. Pritchard*, 745 F.2d 1112, 1122 ·(7th Cir. 1984); *United States v. Niemiec*, 611 F.2d 1207, 1211 (7th Cir.1980).

■ This court has considered the mail fraud statute on numerous occasions, one of the latest being *United States v. Bonansinga*, 773 F.2d 166 (7th Cir.1985). Draiman argues that the mailings do not qualify since they originated with the attorney for the insurance companies and were directed to persons other than the defendant. It can be seen from *Bonansinga* that mailings between innocent parties may sat-

isfy the statute if the scheme has not reached fruition. In the present case the scheme was not completed as Draiman had not collected his inflated damages from the insurers.

■ In *United States v. Lindsey*, 736 F.2d 433, 437 (7th Cir.1984), this court followed other circuits in reading the mail fraud statute expansively and giving it a broad interpretation. The government need only show that Draiman knowingly caused the mails to be used in the furtherance of his scheme. In *Pereira v. United States*, 347 U.S. 1, 8–9, 79 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954), the question of whether or not that standard had been met was found by the Supreme Court to be easily answered since a defendant "causes" the mail to be used when he does an act "with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." As in *United States v. Wormick*, 709 F.2d 454, 461 (7th Cir.1983), Draiman's "approach to mail fraud is far too narrow." That Draiman neither personally mailed any of the letters nor even knew of the particular mailings does not mean that he has slipped by *Pereira*.

■ The "in furtherance" component of mail fraud is likewise to be broadly read and applied. If the mailing is "incident to an essential part of the scheme" the statute is satisfied. *United States v. Lea*, 618 F.2d 426, 430 (7th Cir.1980). That does not mean, however, that the mailing itself must always be an essential part of the scheme, only that it be incident to an essential part. Again Draiman's approach to mail fraud is far too narrow. We shall briefly see if the evidence in the ten mail fraud counts satisfies these general section 1341 requirements.

---

**2.** The mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the pur-

pose of executing such scheme or artifice or attempting to do so ... causes to be delivered by mail ... any ... matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The individual mailings and their content must be examined within the context of the scheme. The scheme did not end with the filing of the false insurance claims with the insurers. That was only the beginning of Draiman's effort to profit from his burglary at the expense of his insurers. Once he filed the claims and the claims were questioned, Draiman did not give up. His continuing efforts to mislead the insurers with false information and the creation of false documents did not succeed in making the scheme profitable, only in laying sufficient basis for these mail fraud counts. The defendant raises specific objections to Counts I, III, IV, V, VI, VII, IX, and X, but only generally as to Counts II and VIII.

### Count I

■ This mailing was a letter, dated December 23, 1981, to Draiman's insurance adjuster from the lawyer representing the insurers confirming that Draiman and his adjuster had been granted additional time to submit a revised detailed statement of loss, and also included a request for additional documents needed to evaluate the claims. The letter put in writing what had been discussed at a meeting between Draiman and his adjuster and representatives of the insurance company. Draiman, relying on *United States v. Kaplan*, 554 F.2d 958, 965 (9th Cir.), *cert. denied sub nom. Dolwig v. United States*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977), and *United States v. Dick*, 744 F.2d 546, 551–52 (7th Cir.1984), claims he did not cause the mailing nor was the mailing foreseeable by him or in furtherance of the scheme.

*Kaplan*, however, is a different situation although facially it might seem helpful. The charged letter in *Kaplan*, which could be called a "confirming letter," was found not sufficient to sustain the mail fraud count. The defendant made certain false oral representations which resulted in the use of the mails by the other party in order to confirm that the defendant had made the statements. Although the false oral representations were considered to be in furtherance of the fraudulent scheme, the letter in response was held not to be as it was not a step toward receipt of the fruits of the scheme in violation of section 1341. That is a distinguishable situation, because Draiman secured additional time by the mailing to try to better falsify his claim and to convince the insurers that he was entitled to the payment of his claim. The *Kaplan* letter was only seeking confirmation of what had already been said, but Draiman was gaining useful time to improve his fraudulent scheme.

In *Dick* the factual situation is also distinguishable. A contractor was awarded a completion contract as part of a scheme to defraud, but that fact, it was held, did not make subsequent mailings to a person a part of the scheme to defraud when that person had no interest in who finished the work or for what price. Those mailings were not related to the scheme.

The government argues that the letter assisted in and was a part of processing the insurance claim, citing *United States v. Contenti*, 735 F.2d 628, 632 (1st Cir.1984), which involved insurance claim mailings for losses from intentional arson. Draiman attempts to distinguish *Contenti* since a part of Draiman's claim was legitimate and resulted from an actual burglary which was not part of the scheme. The scheme however was not to collect what was properly owing, but what was not. Being partly legitimate does not immunize the illegitimate mailings which were part of the scheme to defraud the insurance companies out of the balance.

The government also relies on *United States v. Moss*, 591 F.2d 428, 436–37 (8th Cir.1979), which also involved a "confirming letter." The letter confirmed that a policy would be issued in response to an application. The court found the letter to be in furtherance of the scheme even though it only confirmed what had already been relayed to defendant's agent. The case against Draiman is even stronger as he was gaining necessary time for his fraudulent purposes.

In *United States v. Shaid*, 730 F.2d 225, 229–30 (5th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984),

the defendant could anticipate that mail inquiries would result. Time was gained to plan the responses which were to keep the victim from learning the truth. Mailings from a victim, in *Shaid* the victims' lawyer, which merely restated or reiterated the original demand were held to support mail fraud. It was recognized that each case depends on the particular use made of the mails. *United States v. Toney*, 598 F.2d 1349, 1353 (5th Cir.), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1979). Draiman gained useful time for his ongoing scheme and he could reasonably have foreseen that in dealing with insurance companies and their lawyers that the mail would be used in various ways in connection with his scheme. It is more common than uncommon in these business circumstances that confirmations would be sought in writing.

The questions Draiman raises about this letter are not frivolous, but they are answered by the application of recognized principles to the particular facts. The Count I letter qualifies, as does the similar letter in Count II, both of which granted additional time to Draiman.

### Counts III, IV, and V

During the time extensions granted by the Count I and II mailings Draiman's adjuster personally delivered two proofs of loss and accompanying cover letters to the lawyer representing the two insurance companies. The insurance company lawyer then mailed a set of the papers to each of his client companies and also to the accountant hired by his insurance clients to examine the claims.

The fraudulent scheme was being furthered by filing the claims and their further distribution by mail was reasonably foreseeable. The fact that copies of the same documents provided by Draiman were separately mailed to three different recipients does not immunize all or any of the mailings. Each mailing was a necessary and reasonably anticipated part of the claim processing. No case has been cited holding that separate mailings of the same document do not qualify.

We find no fault with these counts.

### Counts VI and VII

These letters relate to the time set for the taking of the sworn deposition of Draiman and one of his witnesses. When the deposition was taken Draiman offered false information to support his claim. Draiman's witness had been persuaded by Draiman to give false information about the claim relating to the false $10,000 cash loss, and did so. All of this is part of Draiman's efforts to collect on his false insurance claims. Letters played a part in various aspects of his scheme, and these mailings were easily foreseeable. These letters qualify.

### Counts IX and X

Draiman considers these mailings to be most clearly at odds with section 1341's "in furtherance" requirement. They are letters from the lawyer for the insurance companies informing EVM's attorney that the proofs of loss and supporting documentation are not sufficient and requesting clarification. Draiman argues that these mailings conflicted with his scheme rather than furthered it. If in fact the letters did conflict rather than promote the scheme, they would not qualify. *See United States v. Bonansinga*, 773 F.2d 166, 172 (7th Cir. 1985); *United States v. Otto*, 742 F.2d 104 (3d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *United States v. LaFarriere*, 546 F.2d 182 (5th Cir.1977); *United States v. Georgalis*, 631 F.2d 1199 (5th Cir.1980). The distinction is that Draiman was continuing to try to collect, and these letters helped give him another chance.

All the letters and related evidence justified the finding of guilt on these mail fraud counts.

### Evidentiary Rulings

Recognizing that a defendant is entitled to a fair trial, not a perfect one, *United States v. Fountain*, 768 F.2d 790, 797 (7th Cir.1985), the defendant argues that the trial judge, however, committed serious er-

ror by his rulings on various difficult evidentiary questions. We shall briefly examine each.

## A. Admission of Other Crimes Evidence

■ The government presented evidence of other prior fraudulent insurance claims submitted by Draiman after two previous burglaries. Draiman's insurance claims activity suggests that successful burglaries may turn out to be profitable for both the victim and the burglar. Although objected to at trial and argued on appeal, Draiman candidly concedes that the other fraudulent insurance claim evidence, at least arguably, was admissible under Fed.R.Evid. 404(b).[3] We agree on that point since this evidence was sufficiently clear and convincing, and admissible to show specific intent, even if the defendant did not make an issue of intent.

■ Mail fraud is a specific intent crime, and that intent can be shown under Fed.R. Evid. 404(b) even when the defendant, possibly anticipating the damage from other-crimes evidence, seeks to avoid that damage by making no issue of intent. *United States v. Chaimson,* 760 F.2d 798, 804–05 (7th Cir.1985). *See United States v. Weidman,* 572 F.2d 1199 (7th Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). *Chaimson* makes clear that in this circuit the defendant is not permitted unilaterally to remove intent as an element of the crime charged which the government must prove beyond a reasonable doubt.

The government, however, would do well to heed Judge Cudahy's admonition in his *Chaimson* concurrence that the government cannot be permitted to "flood the courtroom" with other-crimes evidence on the excuse that the crime was one of spe-

cific intent. 760 F.2d at 813. The trial judge by the exercise of sound discretion, *United States v. Brown,* 688 F.2d 1112, 1117 (7th Cir.1982), can prevent the evasion of Fed.R.Evid. 404(b)'s restriction that other crimes not be admitted to prove the bad character of the defendant so as to suggest that the defendant was living up to his reputation in the crime currently charged. We consider our *Shackleford* criteria to have been satisfied with regard to the other-crimes evidence in this case:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ..., (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984).

The other-crimes evidence primarily at issue arose from the testimony of Sal Messinger,[4] an important government witness, but a friend of Draiman's who had become an FBI informant against Draiman. Messinger came from New York at Draiman's urging to work for him in Chicago. His testimony in part told about Draiman's request that he create fictitious video tape invoices to support Draiman's insurance claim, and he did. That is briefly as far as direct examination proceeded with Messinger's FBI contacts. Prior to trial the court had ruled that the similar insurance fraud evidence was admissible, but not additional evidence that Draiman had "hot tapes,"

---

3. Fed.R.Evid. 404(b) provides:
   (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

4. Draiman claims that Messinger was an incompetent witness whose testimony could not satisfy the *Shackleford* requirement of clear and

convincing evidence. Draiman bases this claim upon Messinger's response of "I guess, yes" when the trial judge asked if Messinger knew the difference between the truth and a lie. We reject this argument and need not disregard Messinger's testimony. Draiman is actually attacking Messinger's credibility as a witness, not his competency. Credibility is an issue for the jury, and we will not undertake that function in an appellate review. Messinger's testimony was sufficiently clear and convincing to allow the introduction of the other-crimes evidence.

and also dealt in "pirated" tapes, or evidence about any other "illegal" activities of Draiman.

The matter arose again, however, when Draiman's counsel cross-examined Messinger. The government had closed its direct examination by Messinger testifying that it was difficult for him to testify against his friend. Defense counsel then pursued that line. The result was that the court held that by the cross-examination the defense had opened the door for the additional tape and other bad acts evidence. The other evidence included bypassing the electric meters on some of Draiman's properties. The district court viewed the door as having been opened because of the misleading impression the cross-examination had left with the jury.

A dispute had arisen in the evidence about when Messinger first contacted the FBI. He said he had done so before the burglary, and defense counsel sought to impeach that timetable. It was then brought out that Messinger had contacted the FBI earlier because of his concern about Draiman's other activities. There was also some effort to discredit Messinger for turning on his friend and assisting with the fictitious invoices. Instead Messinger should have, defense counsel suggested, done what he could to discourage Draiman from going ahead with the insurance fraud. The cross-examination, the court considered, left the government's principal witness in bad personal light with the jury because the jury had heard only a part of the story. The court, therefore, permitted the full explanation that Messinger had contacted the FBI to report other Draiman offenses.

"Opening the door" is a risk even a skilled defense counsel, as in this case, assumes when a calculated effort is made to tiptoe over thin ice to gain some evidentiary advantage. It also can be a delicate situation for the trial court's exercise of discretion so as not to permit undue preju-

dice to the defendant merely to correct some possible jury impression that may be of no lasting consequence. "Opening the door" is not a newly created risk, and applies in a variety of circumstances. *United States v. Panebianco*, 543 F.2d 447, 454–55 (2d Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977).[5]

The justification for the admission of this particular bad acts evidence does seem somewhat overblown considering its serious reflections on Draiman's character. The government cannot be permitted to use a little defense evidence of little serious consequence to open a big evidentiary door for itself. The government, however, does not have to turn the other cheek when it has the explanation to defense-created misimpressions. The trial court needs to use its seasoned trial experience in a common sense, realistic consideration of the problem.

In these circumstances the door was opened a little and a lot got through. The trial judge had considered the evidence prior to trial, knew what it was, and originally had properly excluded it. When the trial circumstances changed, he exercised his discretion and admitted it. We cannot fully recreate at our bench what he perceived from his. A less controversial but adequate means might have been found to correct any misimpression by limiting Messinger's testimony to the fact that he had consulted the FBI about Draiman for other reasons, without going into damaging detail. On balance we cannot say, however, that the trial judge, in this particular circumstance, abused his discretion. The jury took some time deliberating, but "pirated" tapes and electric meter bypassing, as reprehensible as they are, could have made little difference in this insurance fraud case. In addition to considerable evidence demonstrating insurance fraud, the defendant was properly shown by the evidence of his prior insurance frauds to be experienced in turning burglaries into profitable insurance experiences.

5. *See also United States v. Holladay*, 566 F.2d 1018 (5th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978); *Beck v. United States*, 317 F.2d 865 (5th Cir.1963); *Bracey v.*

*United States*, 142 F.2d 85 (D.C.Cir.), *cert. denied*, 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589 (1944).

## B. Exhibit 47

■ Exhibit 47 purported to be the accounts payable of EVM as of September 16, 1981, about a month after the burglary. It was offered by the government during the direct examination of the certified public accountant hired by both companies to analyze the insurance claims. By the exhibit the government sought to show that $74,000 claimed to be due to a supplier for tapes lost in the burglary was not in fact owed, but was fictitious. Draiman complains the exhibit was not made available during discovery, that it was hearsay and admitted without sufficient foundation.[6]

■ The government responds that the listing of EVM's accounts payable was actually prepared by EVM's own accountant and was both a business record admissible under Fed.R.Evid. 803(6),[7] and an admission under Fed.R.Evid. 801(d)(2).[8] The government's witness, an accountant but not an employee of EVM, testified that the exhibit was prepared in the normal course of business by EVM's accountant and not for the purpose of supporting the insurance claim. Under Rule 803(6) we view the insurance claims accountant a "qualified witness," particularly when his explanation about the list was offered without objection and was uncontradicted. The document itself, a list of EVM's creditors prepared by EVM's accountant and submitted to the insurance companies' accountant to help evaluate EVM's insurance claims, helped provide its own foundation. *Zenith Radio Corp. v. Matsushita Electrical Industrial Co.*, 505 F.Supp. 1190, 1236 (E.D.Pa.1980).

Draiman had a large degree of control over EVM. EVM's accountant was assisting with the insurance claim preparations and the support of the claims, matters in which Draiman was personally actively involved. It appears to be an agency relationship since the accountant was hired by Draiman to do particular accounting work. *United States v. Dolleris*, 408 F.2d 918, 921–22 (6th Cir.), *cert. denied*, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969).

In *United States v. Young*, 736 F.2d 565, 567–68 (10th Cir.1983), *rev'd on other grounds*, —— U.S. ——, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the statement of an accountant employed by a corporation was

---

6. Draiman also claims that this exhibit was a summary under Fed.R.Evid. 1006. Draiman therefore asserts that the government was required to establish the accuracy of the summary and to provide the defense with copies of the underlying documents. The government responds that the document was admissible under Fed.R.Evid. 803(6) because the summary was prepared in the regular course of business, not for litigation. We agree with the government. Rule 1006 contemplates the admission of a summary, prepared for trial, as *secondary* evidence of "voluminous writings, recordings or photographs" that could not conveniently be introduced at trial. 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 1006[01]–[02] (1983). The entries on a business record, however, are considered the original entries, and therefore the business record is admissible without regard to the availability of the underlying documents. *McCormick's Handbook of the Law of Evidence* § 307, at 721 (E. Cleary 2d ed. 1972).

7. Fed.R.Evid. 803(6) provides:

   (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

8. Fed.R.Evid. 801(d)(2) provides:

   (2) Admission by party-opponent. The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

admitted against a corporate officer. Obviously, as *Young* points out, statements of all subordinates cannot be automatically admitted against a party lest the loophole engulf the hearsay rule. In the present case, however, both EVM's accountant and Draiman were working closely together to try to satisfy the insurance companies.

■ Draiman also objects that Exhibit 47 was not produced in pretrial discovery. The government concedes that it was not, but argues that there was no showing of prosecutorial bad faith. When offered, there was no objection to its admission on that ground, nor was additional time requested to review the document. Since it was EVM's own document submitted with its insurance claims, we see no genuine surprise and no prejudice resulting from the government's failure to produce, even though we do not condone the government's failure to fully and technically comply with the discovery orders.

■ Next, Draiman complains that his cross-examination relating to Exhibit 47 was erroneously limited. Draiman sought to introduce into evidence certain invoices for various EVM purchases prior to the burglary in order to show that not all his unpaid bills had been listed as accounts payable on Exhibit 47, the purpose being to try to undermine the completeness and reliability of the exhibit. The government objected to the introduction of the invoices since the invoices did not indicate when or if they had been paid. Without that information it was not possible to use the invoices to show that they had erroneously been omitted from the list of accounts payable. Draiman intended to show that more merchandise was on hand and stolen. The trial judge examined the exhibits during a sidebar and agreed with the government that they were not admissible during cross-examination. We agree for the same reasons.

## C. Draiman's Charge Against Police

■ Two Chicago police officers investigated the burglary. A dispute arose between Draiman and the officers. One of the investigating officers testified that soon after the investigation began Draiman called and asked that the police reports be post-dated so he could include the fictitious $10,000 cash loss in his insurance claim. If that could be arranged, then when Draiman collected on his insurance he advised he would take care of the officers. The officers reported it to their superiors as a bribe attempt. Later after Draiman learned that the FBI had entered the case he filed a complaint against the two officers. His complaint version was that the officers had demanded payoffs of five television sets and five video cassette recorders, and he labeled it extortion. During cross-examination of the officers Draiman tried to bring out the substance of his charges in order to show the officers' prejudice against him. That prejudice, he claims, caused the officers to "make up" the bribery testimony. Draiman did not testify. The court limited the testimony to informing the jury that Draiman had filed a "serious complaint" against the officers.

A defendant has the important right to attempt to show the prejudice of a government witness. In this case Draiman's attempt to show prejudice was not totally curtailed, but was limited to a degree, a matter long recognized to be within the sound discretion of the court. *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). What sound discretion may be in various circumstances may sometimes be debated by reasonable people. The government argues that the evidence would have opened a sideshow and allowed defendant to introduce his "untrue" version without testifying. The truth of Draiman's version, however, is a jury question, even when his version appears to be nothing more than an unfounded self-serving counterattack against the officers. It may have been possible to go briefly into the general nature of the charges without opening a sideshow. However the jury had the benefit of knowing that each party charged the other with wrongdoing so that the claimed basis for bias was evident. There was no need in these circumstances to try the defendant for bribery nor the officers for extortion. We, therefore, do not view the judge's ex-

ercise of discretion to have been an abuse of sound judgment.

### D. A Detective's Conversation with the Burglar

 A Chicago detective testified for the government about his conversation with one of the burglars. Draiman objects to that evidence as hearsay. The conversation was alluded to on the detective's cross-examination when he was asked about a statement he had taken from the burglar. The detective recounted that the burglar confessed to the EVM burglary and stated that he had committed it along with another burglar. There was some suggestion that perhaps other persons had also participated. Draiman was very satisfied with this evidence as it tended to show that the burglars were capable of hauling away more tapes and equipment than the government gave them credit for. However, on redirect the burglar's statement was clarified. The burglar and an accomplice, he explained, had taken $25,000 worth of tapes and hauled them away in a BMW automobile. The balance of the statement fitted in with the government's allegations, not with the inference Draiman sought to leave with the jury.

The burglar's statement was hearsay, but Draiman could not open it up to seek only as much as would leave a favorable, but erroneous, impression with the jury. The government had the right, out of fairness, to the rest of the statement. *United States v. Rubin*, 609 F.2d 51, 63 (2d Cir. 1979), *aff'd*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).

Draiman also objects to the burglar's hearsay because he claims he was unable to impeach the burglar with the burglar's criminal record, or to show that the burglar had received immunity. That could have been error, but the trial judge reversed his position and allowed the impeachment, so there was no harm done.

---

**9.** Fed.R.Evid. 804(b)(3) provides:

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a

Finally, Draiman wanted to have admitted the statement of the burglar's accomplice, who was not present. That statement suggested that a truck had been used, not a car, and that the plan had been to take equipment, not just tapes. Neither the defense nor the government knew where the accomplice was at trial time. The court therefore did not admit the accomplice's hearsay version as Draiman did not make a showing that the accomplice was actually unavailable so as to qualify the statement as a statement against penal interest under Fed.R.Evid. 804(b)(3).[9] The trial court cannot be faulted on that point, or on any of the others which have been raised.

AFFIRMED.

---

reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.