**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lowell LOCKSLEY,**
**Defendant-Appellant.**

No. 85–2981.

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1986.
Decided Feb. 9, 1987.

Lauren J. Weil, Genson & Steinback, Chicago, Ill., for defendant-appellant.

Stephen Crocker, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, WOOD, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Defendant-appellant Lowell Locksley (Locksley) was convicted by a jury of knowingly and willfully passing, uttering and publishing altered United States Postal Service money orders with intent to defraud in violation of 18 U.S.C. §§ 500 and 2. He was given a suspended sentence and placed on a five year period of probation, conditional on him participating in drug and mental health counseling. Locksley appeals on three grounds. First, he believes there was insufficient evidence against him to sustain a conviction. He claims the government failed to prove the element of intent needed to secure a conviction under § 500. He also claims there was insufficient evidence he passed or caused the money orders to be passed. Secondly, Locksley believes his conviction should be reversed due to prosecutorial remarks during closing argument which he deems to have been improper and in violation of his Fifth Amendment rights. Finally, Locksley claims the trial court erred in failing to include evidence of restitution in support of his good faith defense. We find all of

Locksley's arguments without merit and affirm his conviction.

The jury could have found the following facts, an overwhelming number of which Locksley admits in his brief. During the time period of the activities at issue, July 20 through September 27, 1982, Locksley was 23 years old. He lived either with his mother, Bernice, and his older brothers, Morton and Alan, in Skokie or with his wife, Yvonne, in Des Plaines after they had married. Lowell's father had died in a tragic car accident a year earlier.

The Locksley family owned and operated a car repair business called Avalon Park Auto Rebuilders. Alan operated the business on a daily basis and Bernice made all the major business decisions. Defendant Locksley did general office work, primarily writing estimates for auto repairs. His wife, Yvonne, was a secretary. In July, 1982 a decision was made to close the business. As part of the liquidating of the business' assets, Locksley sold used auto parts to various dealers. A dealer named Leroy Jones made several purchases, however, there is conflicting evidence as to whether records were ever kept concerning any of these transactions. Alan said no such records were kept; Yvonne testified otherwise. Defendant Locksley received payment in Postal Service money orders when making the auto parts sales. Family members testified Locksley was allowed to keep the orders for his own use. Yvonne testified Lowell kept the money orders in an envelope in their apartment. The money orders in Locksley's possession were purchased by many individuals. However, it was stipulated that all the money orders in question in this action were issued by Postal Service officials for an amount of one dollar.

From July 20 to September 27, 1982, the following sequence of events occurred:

| July 20 | Locksley cashed five postal money orders apparently worth $300 each at the West 63rd Street Branch of the Chicago City Bank & Trust |

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

Company. The transaction was approved because Locksley was a regular customer through the family business. The checks were not in numerical sequence. The checks listed Locksley as payee and David Jordan as payor. Jordan's home address proved to be the address of a public park. Roy Mantle, a document examiner and handwriting expert with the Postal Service testified at trial and positively identified the endorsement as having been written by Locksley. However, he concluded the printing on the front of the money orders (the "pay to" and "from" information) was not Locksley's.

**July 29** Locksley cashed five more money orders at $291 each at the First National Bank of Skokie (Skokie). They were payable to Locksley from a payor named David Johnson, whose listed home address turned out to be an empty lot. Locksley held a personal account at Skokie. Mantle positively identified the endorsement as Locksley's but did not identify the writing on the front of the money orders as Locksley's.

**August 6** Locksley cashed eight money orders at $300 apiece at Skokie, the payor listed as Leroy Jones whose listed address again turned out to be an empty lot. Out of the $2,400 involved, Locksley put $200 into his account.

**August 12** First, Locksley cashed nine money orders at $300 apiece at Skokie, the payor being Walter Miller. Eight were endorsed by Locksley and deposited in his account, the ninth in Yvonne's account despite its failure to be endorsed. Roy Mantle concluded Locksley printed the information on the front of the money orders and endorsed them.

Secondly, Locksley deposited nine more money orders in the amount of $300 each at the Devon-Central Currency Exchange, the payor again being Walter Miller. The money orders were out of sequence and Miller was deemed to reside in another empty lot. The currency exchange charged Locksley $3.16 for each money order cashed. Apparently the currency exchange did not have enough money to cash Locksley's orders but Locksley agreed to take two currency exchange money orders in the amount of $1,075, paying another $11.25 for these new orders. Mantle concluded Locksley printed the front portions of the money orders and then endorsed them.

Thirdly, Locksley traveled to the Able Currency Exchange to cash 14 money orders each in the amount of $300. Ms. Otto, the cashier there, refused to cash the money orders because they were out of sequence and too numerous. She told Locksley she would copy down the numbers of the money orders and telephone him at a later point. Thereafter Locksley left the premises with the money orders. Ms. Otto then called the Postal Service which told her the money orders had been altered. She called Locksley and told him she would cash his money orders. However, Locksley never returned.

**August 13** Locksley went to the Des Plaines Currency Exchange with ten unendorsed money orders which were also out of sequence. The cashier refused to cash the money orders and in fact held onto them. Currency exchange owner Marvin Citro asked a customer to call the police since the exchange telephone was not working. While this was being done, Locksley left the premises. Citro gave the money orders to the police.

**August 20** Locksley cashed two money orders at Skokie. He also deposited a check into the family business account. The money orders were the same as the ones Locksley had tried to cash earlier at the Able Currency Exchange. The orders were endorsed by Locksley and made payable to Yvonne. Mantle identified Locksley's printing on the front of the money orders and concluded that Locksley probably wrote Yvonne's name on the backside of the money orders.

**September 7** Three money orders were presented by Locksley at Skokie. Again, the three orders comprised part of the 14 money orders the Able Currency Exchange had refused to cash. The orders were made out to Locksley from Walter Miller and payable to Yvonne. Mantle identified the printing on the front of the orders as that of Locksley. He could not make a positive identification of the writing or endorsements on the back.

**September 10** Locksley unsuccessfully tendered two more money orders at Skokie, all of which, once again, had been rejected at the Able Currency Exchange earlier. The money orders were payable to Locksley from Walter Miller, and then endorsed by Locksley and made payable to Yvonne. Yvonne had never endorsed them. Mantle concluded Locksley made out the front portions of the orders and probably signed his endorsement and printed Yvonne's name on the back of one. Mantle could not conclude whether Locksley signed the back of the other orders.

**September 16** Locksley cashed a single money order at Skokie which the Able Currency Exchange would not take. The money order was payable to Locksley from Walter Hill (according to the government) or Walter Miller (according to Locksley). Mantle identified the handwriting on the front and back of the money order as Locksley's.

**September 27** Yvonne brought a $300 money order to the Golf Police Station to bail out a friend. Both Locksley's and Yvonne's names appear signed on the back of the money order. Yvonne testified she signed Locksley's name.

Alan testified on behalf of his brother and stated the business was indeed liquidating in the summer of 1982 and that leftover auto parts were sold to Leroy Jones after a series of meetings for $17,000 in postal money orders. Alan testified no record was kept of this sale. Alan claimed Locksley technically made the sale and did not put the money into the business account, keeping it for himself.

Yvonne testified and stated that she and Locksley separated over the summer of 1982. They kept the money orders in their apartment and when they separated, Locksley asked for the money orders back. She claimed she obliged for the most part, but kept 12 orders for herself. Yvonne stated

Locksley filled in the front of the orders but then she forged his endorsement on the reverse sides without Locksley's permission and cashed them at Skokie. She claimed she did this on the money orders cashed in September. However, on cross-examination Yvonne stated her endorsement on the September 10 money orders was Locksley's.

■ Locksley claims the government failed to prove beyond a reasonable doubt that he knowingly passed or caused to be passed altered postal money orders. We reject this argument as totally unpersuasive. As the government aptly points out, evidence was presented at trial indicating Locksley passed or caused to be passed $18,000 in out-of-sequence money orders in five different locations on nine different days. Some of Locksley's behavior is simply incredible from a person who could be deemed innocent of causing the alterations. For example, on August 13, 1982, why didn't Locksley cash all of the money orders in his possession at Skokie? Why did he subsequently proceed to the Devon-Central Currency Exchange where there was a charge to cash the money orders? Further, why did he go to a second currency exchange, the Able Currency Exchange, after Devon? When Ms. Otto at the Able Currency Exchange later called Locksley to tell him she would cash the orders, why didn't Locksley return?

More questions abound. On August 13, when Des Plaines Currency Exchange owner Citro suspected the orders to be altered and asked a customer to call the police, why did Locksley leave the premises? If he was innocent, why wouldn't he stay to get to the bottom of the matter? Why wouldn't he want to tell the police who gave him these orders so that that person could be apprehended and Locksley could receive any money due to him in a lawful manner? In addition to this circumstantial evidence, there is the testimony of Mr. Mantle as well, who stated Locksley's printing and signature were evident on a number of the altered orders. We could raise more questions to ponder upon and more incriminating evidence as well, however there is no need to. This is because our standard of review in this case is too narrow to entertain and endorse arguments which may conceivably point toward Locksley's innocence. As we stated in *United States v. Draiman*, 784 F.2d 248 (7th Cir. 1986), when reviewing jury findings favorable to the government:

> Our standard of review requires that the evidence be viewed in the light most favorable to the government in determining whether "any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Roman*, 728 F.2d 846, 857 (7th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). In reviewing sufficiency of the evidence at this distance from the trial we must give deference to the jury's weighing of the evidence and its drawing of reasonable inferences. *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984); *United States v. Niemiec*, 611 F.2d 1207 (7th Cir.1980).

*Id.* at 251.

Surely the jury verdict in the case at bar withstands the scrutiny we are to give it as described above.

Defendant also argues along the line that he was convicted on circumstantial evidence "based solely on the piling of inference upon inference." See *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983). What Locksley fails to realize is that, "The test for evaluating circumstantial evidence is the same as in evaluating direct evidence.... Circumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt." *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982) (citing *United States v. Hinds*, 662 F.2d 362, 367 (5th Cir.1981)). We note, as stated in *Redwine*, that:

> ... it is ... imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing

court "must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference...."

715 F.2d at 319.

In sum, after reviewing the evidence and all reasonable inferences in a light most favorable to the government (see *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)) it must be concluded a jury could find beyond a reasonable doubt that Locksley was guilty as charged. We therefore reject Locksley's sufficiency argument.

■ Locksley's second argument is that the government violated his Fifth Amendment right against self-incrimination when the prosecution commented during closing argument that Yvonne, Locksley's wife, testified only "to pinch-hit for her husband, trying to help him." (Tr. 386–88). Locksley claims that since the evidence against him was weak, the failure of the district court to give an immediate curative instruction was an error that cannot be considered harmless beyond a reasonable doubt.

We do not believe the alleged error here constitutes grounds for a mistrial. First, the district court ultimately instructed the jury that, "... the defendant has an absolute right not to testify. The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict." (Tr. 435). Further, we do not believe the evidence against Locksley was as weak as Locksley would like us to believe (see discussion above). We are simply unpersuaded that this isolated remark by the prosecution deprived Locksley of a fair trial. Locksley compares his situation to the one found in *United States ex rel. Burke v. Greer*, 756 F.2d 1295 (7th Cir. 1985). Yet in *Burke*, we noted there were seven indirect references to the defendant's failure to testify and that these seven references were made after the presiding judge warned the prosecutor about making references. Clearly the *Burke* situation was more severe than the instant one where we have one indirect, isolated reference. Of course, we recognize the analysis to be employed here is not how many indirect references were made but rather what kind of indirect reference was made (and any direct reference is always a fifth amendment deprivation. *Id.* at 1300). However, in this case, we do not believe the one indirect reference advanced constitutes grounds to declare a mistrial.

■ Defendant's final argument is that the district court erred in excluding evidence of restitution which Locksley claims was crucial to making a determination that he intended to defraud when he passed the altered money orders. Yet, the record reveals the restitution was made by Locksley's mother, not Locksley himself. (Tr. 317–18). Acts of Locksley's mother are obviously immaterial and irrelevant to the issue of Locksley's intent.

For the reasons set forth above, the decision of the district court is

AFFIRMED.