811 F.2d 1104
 UNITED STATES of America, Plaintiff-Appellee,
v.
Lowell LOCKSLEY, Defendant-Appellant.
 No. 85-2981.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 12, 1986.
Decided Feb. 9, 1987.
 
 1
 Lauren J. Weil, Genson & Steinback, Chicago, Ill., for defendant-appellant.
 
 
 2
 Stephen Crocker, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.
 
 
 3
 Before BAUER, Chief Judge, WOOD, Circuit Judge, and CAMPBELL, Senior District Judge.*
 
 
 4
 WILLIAM J. CAMPBELL, Senior District Judge.
 
 
 5
 Defendant-appellant Lowell Locksley (Locksley) was convicted by a jury of knowingly and willfully passing, uttering and publishing altered United States Postal Service money orders with intent to defraud in violation of 18 U.S.C. Secs. 500 and 2. He was given a suspended sentence and placed on a five year period of probation, conditional on him participating in drug and mental health counseling. Locksley appeals on three grounds. First, he believes there was insufficient evidence against him to sustain a conviction. He claims the government failed to prove the element of intent needed to secure a conviction under Sec. 500. He also claims there was insufficient evidence he passed or caused the money orders to be passed. Secondly, Locksley believes his conviction should be reversed due to prosecutorial remarks during closing argument which he deems to have been improper and in violation of his Fifth Amendment rights. Finally, Locksley claims the trial court erred in failing to include evidence of restitution in support of his good faith defense. We find all of Locksley's arguments without merit and affirm his conviction.
 
 
 6
 The jury could have found the following facts, an overwhelming number of which Locksley admits in his brief. During the time period of the activities at issue, July 20 through September 27, 1982, Locksley was 23 years old. He lived either with his mother, Bernice, and his older brothers, Morton and Alan, in Skokie or with his wife, Yvonne, in Des Plaines after they had married. Lowell's father had died in a tragic car accident a year earlier.
 
 
 7
 The Locksley family owned and operated a car repair business called Avalon Park Auto Rebuilders. Alan operated the business on a daily basis and Bernice made all the major business decisions. Defendant Locksley did general office work, primarily writing estimates for auto repairs. His wife, Yvonne, was a secretary. In July, 1982 a decision was made to close the business. As part of the liquidating of the business' assets, Locksley sold used auto parts to various dealers. A dealer named Leroy Jones made several purchases, however, there is conflicting evidence as to whether records were ever kept concerning any of these transactions. Alan said no such records were kept; Yvonne testified otherwise. Defendant Locksley received payment in Postal Service money orders when making the auto parts sales. Family members testified Locksley was allowed to keep the orders for his own use. Yvonne testified Lowell kept the money orders in an envelope in their apartment. The money orders in Locksley's possession were purchased by many individuals. However, it was stipulated that all the money orders in question in this action were issued by Postal Service officials for an amount of one dollar.
 
 
 8
 From July 20 to September 27, 1982, the following sequence of events occurred:Alan testified on behalf of his brother and stated the business was indeed liquidating in the summer of 1982 and that leftover auto parts were sold to Leroy Jones after a series of meetings for $17,000 in postal money orders. Alan testified no record was kept of this sale. Alan claimed Locksley technically made the sale and did not put the money into the business account, keeping it for himself.
 
 
 9
 Yvonne testified and stated that she and Locksley separated over the summer of 1982. They kept the money orders in their apartment and when they separated, Locksley asked for the money orders back. She claimed she obliged for the most part, but kept 12 orders for herself. Yvonne stated Locksley filled in the front of the orders but then she forged his endorsement on the reverse sides without Locksley's permission and cashed them at Skokie. She claimed she did this on the money orders cashed in September. However, on cross-examination Yvonne stated her endorsement on the September 10 money orders was Locksley's.
 
 
 10
 Locksley claims the government failed to prove beyond a reasonable doubt that he knowingly passed or caused to be passed altered postal money orders. We reject this argument as totally unpersuasive. As the government aptly points out, evidence was presented at trial indicating Locksley passed or caused to be passed $18,000 in out-of-sequence money orders in five different locations on nine different days. Some of Locksley's behavior is simply incredible from a person who could be deemed innocent of causing the alterations. For example, on August 13, 1982, why didn't Locksley cash all of the money orders in his possession at Skokie? Why did he subsequently proceed to the Devon-Central Currency Exchange where there was a charge to cash the money orders? Further, why did he go to a second currency exchange, the Able Currency Exchange, after Devon? When Ms. Otto at the Able Currency Exchange later called Locksley to tell him she would cash the orders, why didn't Locksley return?
 
 
 11
 More questions abound. On August 13, when Des Plaines Currency Exchange owner Citro suspected the orders to be altered and asked a customer to call the police, why did Locksley leave the premises? If he was innocent, why wouldn't he stay to get to the bottom of the matter? Why wouldn't he want to tell the police who gave him these orders so that that person could be apprehended and Locksley could receive any money due to him in a lawful manner? In addition to this circumstantial evidence, there is the testimony of Mr. Mantle as well, who stated Locksley's printing and signature were evident on a number of the altered orders. We could raise more questions to ponder upon and more incriminating evidence as well, however there is no need to. This is because our standard of review in this case is too narrow to entertain and endorse arguments which may conceivably point toward Locksley's innocence. As we stated in United States v. Draiman, 784 F.2d 248 (7th Cir.1986), when reviewing jury findings favorable to the government:
 
 
 12
 Our standard of review requires that the evidence be viewed in the light most favorable to the government in determining whether "any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Roman, 728 F.2d 846, 857 (7th Cir.), cert. denied, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). In reviewing sufficiency of the evidence at this distance from the trial we must give deference to the jury's weighing of the evidence and its drawing of reasonable inferences. United States v. Pritchard, 745 F.2d 1112, 1122 (7th Cir.1984); United States v. Niemiec, 611 F.2d 1207 (7th Cir.1980).
 
 
 13
 Id. at 251.
 
 
 14
 Surely the jury verdict in the case at bar withstands the scrutiny we are to give it as described above.
 
 
 15
 Defendant also argues along the line that he was convicted on circumstantial evidence "based solely on the piling of inference upon inference." See United States v. Redwine, 715 F.2d 315, 319 (7th Cir.1983). What Locksley fails to realize is that, "The test for evaluating circumstantial evidence is the same as in evaluating direct evidence.... Circumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt." United States v. Henderson, 693 F.2d 1028, 1030 (11th Cir.1982) (citing United States v. Hinds, 662 F.2d 362, 367 (5th Cir.1981)). We note, as stated in Redwine, that:
 
 
 16
 ... it is ... imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court "must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference...."
 
 
 17
 715 F.2d at 319.
 
 
 18
 In sum, after reviewing the evidence and all reasonable inferences in a light most favorable to the government (see Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)) it must be concluded a jury could find beyond a reasonable doubt that Locksley was guilty as charged. We therefore reject Locksley's sufficiency argument.
 
 
 19
 Locksley's second argument is that the government violated his Fifth Amendment right against self-incrimination when the prosecution commented during closing argument that Yvonne, Locksley's wife, testified only "to pinch-hit for her husband, trying to help him." (Tr. 386-88). Locksley claims that since the evidence against him was weak, the failure of the district court to give an immediate curative instruction was an error that cannot be considered harmless beyond a reasonable doubt.
 
 
 20
 We do not believe the alleged error here constitutes grounds for a mistrial. First, the district court ultimately instructed the jury that, "... the defendant has an absolute right not to testify. The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict." (Tr. 435). Further, we do not believe the evidence against Locksley was as weak as Locksley would like us to believe (see discussion above). We are simply unpersuaded that this isolated remark by the prosecution deprived Locksley of a fair trial. Locksley compares his situation to the one found in United States ex rel. Burke v. Greer, 756 F.2d 1295 (7th Cir.1985). Yet in Burke, we noted there were seven indirect references to the defendant's failure to testify and that these seven references were made after the presiding judge warned the prosecutor about making references. Clearly the Burke situation was more severe than the instant one where we have one indirect, isolated reference. Of course, we recognize the analysis to be employed here is not how many indirect references were made but rather what kind of indirect reference was made (and any direct reference is always a fifth amendment deprivation. Id. at 1300). However, in this case, we do not believe the one indirect reference advanced constitutes grounds to declare a mistrial.
 
 
 21
 Defendant's final argument is that the district court erred in excluding evidence of restitution which Locksley claims was crucial to making a determination that he intended to defraud when he passed the altered money orders. Yet, the record reveals the restitution was made by Locksley's mother, not Locksley himself. (Tr. 317-18). Acts of Locksley's mother are obviously immaterial and irrelevant to the issue of Locksley's intent.
 
 
 22
 For the reasons set forth above, the decision of the district court is
 
 
 23
 AFFIRMED.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation