28 F.3d 1216
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John ISENHOWER, Defendant-Appellant.
 No. 93-3755.
 United States Court of Appeals, Seventh Circuit.
 Argued June 14, 1994.
Decided July 8, 1994.
 
 Before ESCHBACH, COFFEY and FLAUM, Circuit Judges.
 
 ORDER
 Background
 
 1
 A jury found defendant John Isenhower guilty of two counts of wire fraud in violation of 18 U.S.C. Sec. 1343, for causing wire transfers of money from the accounts of Armed Forces veterans pursuant to a fraudulent scheme, and six counts of embezzlement in violation of 38 U.S.C. Sec. 3501[1] for taking money from accounts of veterans. Isenhower was sentenced to one year and one day in prison, and one year probation. On appeal, Isenhower challenges the sufficiency of the evidence.
 
 
 2
 When an incompetent veteran does not have sufficient money to hire a bank or attorney as a guardian, the Veteran's Administration (V.A.) appoints a fiduciary, who is to make money available to the veteran for rent, utilities, food, or other needs and reasonable wants. A fiduciary simply oversees and manages V.A. benefits and does not manage private funds belonging to the veterans. The fiduciaries submit accountings to the V.A. once a year. In 1984, Congress for the first time provided that such fiduciaries could be paid for these services. They could receive a fee of up to 4-percent of the annual V.A. funds paid to the veteran. Also in 1984, Isenhower, who had been working for the V.A., decided to open his own business where he would act as a fiduciary for incompetent veterans. He started a non-for-profit Illinois corporation called the Illinois Guardianship Services (IGS).
 
 
 3
 Within a short time, Isenhower became the fiduciary for 32 veterans who had been rated incompetent to handle their financial affairs. Using direct deposit, he caused the veterans' V.A. benefits or Social Security benefits to be deposited into IGS's fiduciary accounts. In the next few years, Isenhower acquired control of $552,000 for the veterans' accounts; he took $134,063 for himself.
 
 Standard of Review
 
 4
 Isenhower acknowledges that the standard of review under Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979), is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Isenhower asks that we instead require "substantial evidence that there was sufficient proof," which would ensure that the reviewing court will not be satisfied with only a "mere modicum" of proof. Isenhower argues that the Jackson "rule may also result in a 'misapplication of the constitutional standard of beyond a reasonable doubt." (Appellant Brief, p. 9, quoting Jackson, at 316.) This argument makes little sense. Neither this court nor any other court requires a "mere modicum" to uphold a criminal conviction. See, e.g., United States v. Santos, 1994 WL 96043 (7th Cir. March 25, 1994) ("[t]he verdict of a jury must be sustained if there was substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80 (1942)").
 
 Sufficiency of the Evidence
 
 5
 The elements of wire fraud require proof that defendant devised or participated in the scheme to defraud; that defendant caused the interstate wire communications to take place in the manner charged for the purpose of carrying out the scheme; and that he did so knowingly and with intent to defraud. 18 U.S.C. Sec. 1343; Federal Criminal Jury Instructions of the Seventh Circuit, Seventh Circuit Committee, Vol. II (1984) at 89. Wire fraud is a specific intent crime. United States v. LeDonne, 21 F.3d 1418, 1428-1429 (7th Cir.1994); United States v. Draiman, 784 F.2d 248, 254 (7th Cir.1986).
 
 
 6
 Isenhower only contends that there was insufficient evidence of intent. The evidence presented to the jury included proof of intent to defraud the veterans and convert the money to his own use. Isenhower does not dispute that he took $134,063 out of a total of $552,085; and does not dispute the evidence that he paid himself for services he never rendered,[2] paid himself for expenses that were not within the fiduciary agreement,[3] and paid himself for unauthorized charges.[4] Isenhower also began draining veterans' accounts into his own account after the V.A. began the investigation into his activities.[5]
 
 
 7
 The jury was entitled to find from this extensive and detailed evidence that Isenhower intended to commit wire fraud and embezzlement.
 
 
 8
 Isenhower argues, however, that the mere fact that he received $134,063 out of a total amount of funds of $552,085 was insufficient to demonstrate an intent to defraud. "The government's case rests on the unsupported inference that the expenditures, because of their volume and size alone, constituted substantial evidence of an intent to defraud...." This argument is hardly persuasive since the evidence of intent did not need to rely on volume or size.
 
 
 9
 Isenhower argues that there was no "secrecy" involved to establish intent. The fact that some of his actions were blatant does not mean they were not fraudulent. The evidence also shows, however, that Isenhower frequently lied or misrepresented facts to the veterans and the V.A., and to the veterans' families. For example, lack of candor was apparent when Veteran Hollingsworth learned that Isenhower had paid himself $300 for visiting Veteran Hollingsworth downstate, although the veteran did not appear for the appointment. The veteran later asked the V.A. to investigate the matter. The V.A. was told by Isenhower that he only decided to visit Hollingsworth because he "wanted to become acquainted with his veterans that he was assigned as a representative payee for that he had a sister who lived in the St. Louis area...."
 
 
 10
 Isenhower also insists that there were no "false accountings" submitted by him. The evidence shows otherwise. Isenhower filed grossly inaccurate accountings. For example, he reported to the V.A. that Veteran Joyce had paid him $8,700; the records showed that Isenhower actually took $15,708 from Joyce.
 
 
 11
 Isenhower argues that no one "testified that any of the expenditures were improper." As detailed above, the record shows quite the contrary.
 
 
 12
 And, Isenhower says, to prove the expenditures to himself were proper, the vast majority of the 4500 checks "had a notation regarding services rendered." This makes little difference where the evidence clearly established that the "services" were either not rendered, not necessary, or otherwise inappropriate.
 
 
 13
 Isenhower also contends that the evidence does not indicate that he knew about the 4% rule. There was testimony before the jury, however, that Isenhower was informed several times about the 4% rule. Moreover, with or without the 4% rule, Isenhower's conduct violated the law.
 
 
 14
 Isenhower seems to imply that the government should not be allowed to prove intent because the V.A. approved expenditures. Isenhower concedes that the approvals were probably in error, but adds that if the payments he received were excessive and the V.A. "dropp[ed] the ball," Isenhower could not have "known better," because he never received "notice about what he should have known." Isenhower cites no authority for this novel estoppel-like concept.
 
 
 15
 The V.A. apparently decided to approve three accountings because Isenhower had "already spent the money" meant for Veterans Haralson, Parke and Cotton. At the same time, however, Isenhower was told not to perform any further services for the veterans. Moreover, the jury was aware of these approvals when it found Isenhower guilty.
 
 
 16
 Finally, Isenhower argues that the "government brought utterly unreliable witnesses" who testified they did not remember Isenhower visiting the veterans. The credibility of witnesses who testified regarding whether or not Isenhower visited certain veterans is a question for the jury, not for this court. See United States v. Campbell, 985 F.2d 341, 344 (7th Cir.1993).
 
 Conclusion
 
 17
 For these reasons, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 Now codified at 38 U.S.C. Sec. 6101
 
 
 [2]
 Examples of charges for services not rendered:
 Veteran Joyce was charged $882.15 for "monthly compensation" through December 31, 1986, despite the fact that he died on September 22, 1986. Veteran Joyce was also charged for 70 unexplained instances of "special correspondence."
 Veteran Brown was charged for 26 visits; employee of residence shelter testified that Isenhower visited only one time, for 10 or 15 minutes, and twice a man who said he worked for Isenhower visited for 10 to 20 minutes.
 Veteran Haralson was charged for 80 instances of "special correspondence"; his mother testified that Isenhower visited ten times to take his shopping and to court, but never provided counseling or educational services. Haralson's mother also gave Isenhower her son's car to sell, but never received any money for the car.
 Veteran Kolmar was charged for 26 visits at $150 each; two of the nursing facility employees [Cindy Murphy and Glenda Alexander] testified that Isenhower never visited.
 
 
 [3]
 Examples of expenses not within the fiduciary agreement:
 Isenhower charged for 251 "downstate visits" at $150 each; these visits unnecessary because veterans are either in a nursing home, or are visited (without charge) by social workers and field examiners.
 Despite the fact that a VA social worker visited Veteran Stalling once each month, Stalling was charged for 12 visits by Isenhower. The person he lived with testified that Isenhower only visited twice for 20 minutes, and his employees visited once for a few minutes; they provided no counseling to the veteran.
 Veteran Brown was charged $6,825, despite the fact that he was living in a residential shelter and was so dysfunctional that he remained mute and was unable to communicate or cooperate with field agents who visited him.
 
 
 [4]
 Example of unauthorized charges: Isenhower took title to a car purchased with funds belonging to Veteran Parke, and had Parke pay him twice (over $1,600) for "negotiating the purchase."
 
 
 [5]
 Examples of draining of accounts:
 Isenhower said he was returning $1,406 from Veteran Batts to the V.A.; in fact, he took the total amount.
 Isenhower asked the V.A. for $800 for Veteran Gnuse, and wrote a check to himself for $500 and to his wife for $300.
 Isenhower closed Veteran Joyce's account and told the V.A. he would return $1,879 in overpayments; however, he sent only $1,243 to the V.A. and wrote himself a check for $744. Later, he emptied the account by writing himself a check for the remaining $3,791.
 Isenhower closed Veteran Spears' account by writing himself a check for the total of $3,888.
 Isenhower took $8,000 out of Veteran Kolmar's account, leaving only 56 cents.
 Isenhower told the V.A. he had returned all funds to Veteran Haralson; two days later he emptied Haralson's accounts by writing a check to himself for $2,858.
 Isenhower drained Veteran Stalling's account of $2,670; when the V.A. sent another $1,355, Isenhower took that, too.
 Isenhower drained the funds for Veteran Ciuffini's widow of $1,059.
 Finally, Isenhower closed out 32 accounts in February 1987; he refunded money on only 11 of the accounts.